## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 93-KA-00965-SCT

*CURTIS LEE NELSON*

*v.*

*STATE OF MISSISSIPPI*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/93 |
| TRIAL JUDGE: | HON. RICHARD T. WATSON |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TIM D. BLALOCK |
| | L. H. ROSENTHAL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: WAYNE SNUGGS |
| DISTRICT ATTORNEYS: | RONNIE HARPER |
| | FORREST A. JOHNSON, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND RENDERED - 11/20/97 |
| MOTION FOR REHEARING FILED: 12/04/1997 | |
| MANDATE ISSUED: | |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

In this matter we consider whether a defendant's murder conviction was against the overwhelming weight of the evidence. Finding that the State failed to prove the defendant's guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, we reverse and render.

### I.

On the morning of July 1, 1992, Georgia Mae Evans was brutally attacked and died as a result of multiple stab wounds. On November 2, 1992, Curtis Lee Nelson was indicted by an Adams County

grand jury for her murder.

Patricia Johnson, the victim's oldest sister, testified that she knew from her daily visits with her sister that Nelson was crazy about her sister and wanted to marry her. Evans, on the other hand, was scared of Nelson and wanted to keep him away from her. After last seeing her sister around 10:45 P.M. on June 30, 1992, Johnson discovered her body the next morning. Johnson knew that Evans was scared of Nelson. Evans had previously called the police regarding her fear of Nelson. At Nelson's trial, Johnson testified that a letter she found in her sister's purse was in her sister's handwriting. The letter, dated May 19, 1992 and addressed to someone named Michael, stated that Evans "couldn't let some kind of fool mess up [her] life." She stated in the letter that it had been a long time since this person had been involved in her life, but that he had called her and that he did not have a "damn soul." In the letter, Nelson told Evans if he could not have her, nobody could.[1] Nelson was married with children.

Jacqueline Jackson, the victim's other sister, testified that she knew that Evans was afraid of Nelson. Jackson testified that she told her sister to buy a pistol, but Evans refused. Jackson knew that her sister had been in a relationship with Nelson which ended in 1991. She also knew that her sister had been recently involved in another relationship with someone else. Jackson also identified the letter found in the victim's purse as being in her sister's handwriting. In addition, Jackson remembered Nelson coming by her sister's home once, but not being allowed to come up to the house. She also testified that her sister's new boyfriend had temporarily stopped seeing Evans due to Nelson's threats.

Janet Baldwin, the victim's cousin, testified that she was visiting with the victim one day when the telephone rang. The victim answered the phone and told Baldwin to pick up the phone to listen. When Baldwin did, she heard Nelson state, "Ms. Evans, stick your pretty little head out of the door so I can see your pretty face." When the victim refused to come outside, Baldwin testified that Nelson stated, "Georgia Mae, don't have me come up there and kill you." Baldwin told Evans to hang up the phone. Then, Baldwin ran to the front of the house where she saw Nelson come by Evans' house. Baldwin identified Nelson as the person whose voice she heard on the phone that day. The phone conversation occurred about a week and a half prior to Evans' death.

Brenda Albert, a long time friend of the victim, testified that Nelson once came to Evans' home, parked his truck, and told one of the victim's twin children to come and get some money. However, Evans did not allow the child to go.

Jimmie Johnson testified that he had known Evans and Nelson quite well. According to Johnson, Nelson came by Johnson's house before the victim's death and told him that he dreamed that one of Evans' boyfriends broke into her house and stabbed and killed her. This conversation occurred a few weeks prior to Evans' death. Johnson further testified that Nelson told him that he caught a boy in the victim's bed, and when Evans asked the boy to get her mother because Nelson was being violent, Nelson threatened, "Well, if he do, I'll kill him."

Hobie Rhines testified that he had been dating Evans, whom he had met previously at the church they both attended. Rhines testified that on one occasion when he spent the night with Evans, he was awakened by a phone call which Evans answered. Rhines fell back asleep; however he was awakened shortly thereafter when he saw Evans and Nelson coming through the bedroom door. Nelson was being very abusive to the victim, and she was trying to get away from him. Nelson threw her on the

bed, and Rhines jumped up and began to get dressed.

Rhines further testified that Evans told him that she was not dating anyone else, specifically that she was not dating Nelson. Rhines watched Evans struggle with Nelson as she attempted to use the telephone to call her mother. Nelson would not allow her to use the phone. Evans told Rhines that he should leave, and she asked him to get her mother. That night Rhines testified that he overheard Nelson say to Evans, "I told you what's going to happen if I catch you with another man here." Rhines wanted to help Evans, but he did not know if Nelson was armed. Thus, he decided not to intervene. After Evans asked Rhines to bring her mother, Nelson said to him, "I'll kill you if you do." Nevertheless, Rhines brought Evans' mother over, left, and never returned. This incident occurred in May 1992, a few weeks before the murder.

Dr. Steve Haynes, a qualified forensic medical expert, testified that Evans died as a result of multiple stab wounds. He performed an autopsy on Evans on July 1, 1992, finding twenty-three stab wounds, seven slash wounds, and four puncture wounds. Haynes further testified that the identified murder weapon was a large knife. The triangular wounds observed on the victim were consistent with a large single-edged weapon. The deepest wound to the victim's body was about four or five inches into her body cavity. There was also evidence that Evans attempted to protect herself by using her hands to cover her face, neck, and upper chest area, evidenced by injuries to her hands. Haynes also testified that the fresh puncture wound found on Nelson's thigh was similar in nature to the wounds inflicted upon the victim and that Nelson's wound could have been made with a similar triangular-shaped weapon.

Jacqueline Posey, a friend and former schoolmate of Evans, testified that she was aware that Evans was afraid of Nelson because Evans told her this in late May. Posey also saw Nelson leaving Evans' house one day when the police came. Posey had also seen bruises on Evans' left arm in May 1992, a few weeks prior to her death.

Robert Lee Dawson, an investigator with the Natchez Police Department, was present when Nelson was asked to remove his clothes. Dawson saw a fresh puncture wound on his left thigh. A photograph of this wound was entered into evidence.

Barbara Miller, a Natchez Police Department employee, went to Nelson's house on July 1, 1992. She asked Nelson's wife for his most recently removed clothes. Nelson's wife gave Miller a pair of pants and a shirt. Miller turned the clothes over to another detective for an analysis.

Detective Tom McGehee received a call on July 1, 1992 reporting Evans' death. McGehee went over and videotaped Evans' home, particularly the condition of the room where she was found. Detective McGehee testified that the test of the semen found in the victim's body could have come from either Rhines or Nelson. However, Rhines testified that he last visited the victim on June 30, 1992 and that they had not been sexually intimate on that evening.

Mike Mullins testified that he was notified of the homicide at approximately 6:45 a.m. He accompanied Captain Eaton to the Vidalia Police Department, where they picked up Nelson. Nelson voluntarily returned to Natchez. Nelson was given his *Miranda* rights, and after he signed a waiver of those rights and the right to assistance of counsel, the officers questioned him.

During the questioning, Nelson stated that he was the victim's boyfriend. He claimed that they had a good relationship until he caught her with another man in her house. Nelson also claimed that he did not visit Evans' house after she told him to stay away. He stated that the man, whom he found in Evans' house, was named Mike or Michael and that this had occurred a couple of months prior to the murder. Nelson further stated that he once told the victim that he "ought to get that machete out and cut her neck off." On the day of the murder, however, Nelson claimed that he had gone to Marsaw's for breakfast at 5:00 a.m. When questioned about the fresh wound on his thigh, Nelson claimed that he wounded himself on his truck door, stating that there was chrome on the vehicle's door.

Mullins found no one at Marsaw's who had seen Nelson on July 1, 1992. Mullins further stated that Nelson never asked why he was being questioned and showed no emotion when they told him that Evans had been murdered.

At the close of the State's case, Nelson moved for a directed verdict. In denying the motion, the trial court stated the following:

> The Court has heard the evidence. While the State concedes it is a circumstantial case, the Court is particularly impressed with the fact that the defendant and the deceased had intimate relations involving sexual activity for a number of years. At this point, it is undisputed that this relationship was broken off by the decedent sometime prior to the date of death. After the relationship was attempted to be terminated by the deceased, the defendant made threats to kill the decedent and others, or at least one other; that he made trips by the house of the decedent. And it's undisputed evidence that he kept peeping through the windows that necessitated the putting up of aluminum foil around the windows; that he had been guilty of physical abuse . . . prior to the date of the alleged murder and has been pointed out the key point of the State's evidence that on the morning of the murder, law officers determined that the defendant had suffered an injury to his right thigh. An expert, Dr. Haynes, testified that this injury was inflicted similar to, not the instrument, that was used in the murder of the decedent, which in his opinion was something similar to a kitchen knife or butcher knife. The Court reiterates that strong evidence, circumstantial in nature, is that the defendant threatened the life of the decedent prior to this incident, and did, in fact, physically abuse her. Based upon all of the evidence as counsel stated including eighteen witnesses and sixteen exhibits, the Court feels that the State has made a strong circumstantial evidence case in this regard and the facts justified submission of this case to the jury as a question of fact to be determined by the jury. Therefore, the motion for a directed verdict is overruled.

Based upon the preceding evidence, the jury found Nelson guilty of murder, and he was sentenced to life imprisonment. On August 5, 1993, Nelson filed a motion to set aside the verdict and for a new trial. It was denied on August 9, 1993. Nelson presently appeals.

## II.

"The *corpus delicti* in a homicide case consists of (1) the death of a human being, and (2) a criminal agency causing the death." *May v. State*, 524 So. 2d 957, 966 (Miss. 1988) (quoting *Miskelley v. State*, 480 So. 2d 1104, 1107 (Miss. 1986)). The State may prove the crime (*corpus delicti*) by circumstantial evidence, but where a case is based wholly on circumstantial evidence, the State must prove the defendant's guilt "beyond a reasonable doubt and to the exclusion of every reasonable

hypothesis consistent with innocence." *Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988); *Montgomery v. State*, 515 So. 2d 845, 848 (Miss. 1987); *Westbrook v. State*, 202 Miss. 426, 433, 32 So. 2d 251, 251 (1947).

The standard used in assessing a motion for judgment notwithstanding the verdict was clearly set out by this Court in *Pharr v. State*, 465 So. 2d 294 (Miss. 1984). There, we noted that such motions test the legal sufficiency of the evidence supporting the verdict of guilty. These motions renew the defendant's request for a peremptory instruction that was made at the close of all the evidence. Such a motion asks the court to hold, as a matter of law, that the verdict may not stand. *Id.* at 301. When a defendant moves for a judgment notwithstanding the verdict, "the trial court must consider all of the evidence--not just the evidence which supports the State's case--in the light most favorable to the State." *May v. State,* 460 So. 2d 778, 781 (Miss. 1984). The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Glass v. State*, 278 So. 2d 384, 386 (Miss. 1973).

If the facts and inferences so considered favor the defendant with sufficient force that reasonable people could not have found him guilty beyond a reasonable doubt, the motion for judgment notwithstanding the verdict must be granted. On the other hand, if there is substantial evidence opposing the motion, that is, evidence of such quality and weight which could cause reasonable fair-minded people in the exercise of impartial judgment to reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. *May*, 460 So. 2d at 781.

In other words, once the jury has returned a verdict of guilty in a criminal case, this Court is not at liberty to direct that the defendant be discharged, short of a conclusion on our part that the evidence, taken in the light most favorable to the verdict, is such that no reasonable juror could have found the defendant guilty beyond a reasonable doubt. *Pharr*, 465 So. 2d at 301; *Hester v. State*, 463 So. 2d 1087, 1093 (Miss. 1985) ("While keeping in mind that each circumstantial evidence case turns on its own facts, and that it is peculiarly within the jury's province to draw reasonable inferences based upon its own experience and common sense, we have previously rejected the concept of guilt by association").

In the instant case, the trial court denied Nelson's motion for a directed verdict because the evidence established the following:

> 1. that Nelson and Evans had engaged in an intimate, sexual relationship for a number of years;
>
> 2. that Evans had ended the relationship prior to her death;
>
> 3. that Nelson threatened Evans and others;
>
> 4. that Nelson continued to go to Evans' home;
>
> 5. that Nelson kept peeping in Evans' windows causing her to cover them with aluminum foil;
>
> 6. that Nelson physically abused Evans prior to her death;
>
> 7. that police officers found an injury on Nelson's right thigh on the day of the murder which could have been inflicted by the murder weapon; and

8. that Dr. Haynes testified that Nelson's injury was inflicted by an instrument similar to the one which killed Evans.

Based upon these findings, the trial court concluded that there was sufficient circumstantial evidence for the jury to decide the case, instead of granting Nelson's motion for directed verdict.

## III.

On appeal, the State defends the jury's verdict by emphasizing that the evidence established that Nelson had threatened and abused Evans on previous occasions, that Nelson had been spying on Evans, that Nelson was jealous of Evans' other relationship, that Nelson had an opportunity to commit the murder, that his alibi was not corroborated, that Nelson had a recent injury on his leg which could have been made with a similar instrument as the murder weapon, and that Nelson's explanations as to how his leg was injured was contradicted by the officer's testimony, to support the jury's verdict of guilt. Also, the State put on evidence of Nelson's motive.

Notwithstanding this circumstantial evidence, this Court is faced with the fact that there was no substantial evidence putting Nelson at the murder scene. While the evidence established that, based upon the time line of the murder, Nelson had the opportunity to commit the murder, the only evidence that could link Nelson to the murder scene was the doctor's testimony that the wound on his thigh could have been made by the murder weapon.

The State argues that Nelson's explanation of the thigh wound was contradicted by testimony of Officer McGehee. The officer testified that he inspected Nelson's truck and found nothing which could have inflicted the wound on Nelson's thigh. The State would like to rely on this alleged contradiction as evidence of Nelson's guilt. However, McGehee's inspection of the truck was a visual one only. He did not run a blood test on the truck door. Thus, this circumstantial evidence does not provide proof of Nelson's guilt. Similarly, the State relies on the fact that no one at Marsaw's could verify that Nelson had been at the restaurant on the day of the murder as he claimed. This circumstantial piece of evidence likewise fails to sustain the conviction. Moreover, while the evidence showed that Evans had recently had consensual sexual intercourse, the semen sample was not shown to come from Nelson. At most, the State established that the semen could have come from Nelson or from Evans' boyfriend.

Again, where the State's case is based upon circumstantial evidence, the State "must prove the defendant's guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence." ***Steele v. State***, 544 So. 2d 802, 808 (Miss. 1989). This Court obviously must reverse and render a criminal conviction where the defendant's guilt is not proven beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. ***Id.***

Based upon our review of the evidence in the instant case, this Court finds that the State did not prove Nelson's guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Although the State's evidence proved that Nelson had physically abused the victim in the past, there was no evidence that he killed her. The semen found in the victim's body could have been Nelson's or it could have come from the victim's boyfriend. Likewise, the officer's mere visual inspection of Nelson's truck was not enough to disprove Nelson's claim that he wounded himself on the door.

We therefore conclude that Nelson's conviction for the murder of Georgia Mae Evans must be set aside as the evidence indicates the conviction was based upon a mere probability that Nelson was guilty. *Id.* at 809 (setting aside jury's guilty verdict of murder where evidence was legally insufficient to establish anything more than a probability of guilt); *see also Daumer v. State*, 381 So. 2d 1014 (Miss. 1980) (setting aside murder conviction where evidence of guilt was insufficient). We reverse and render.

**REVERSED AND RENDERED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., AND McRAE, J., CONCUR. PITTMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS, SMITH AND MILLS, JJ.**

**PITTMAN, JUSTICE, DISSENTING:**

Finding that the facts in this case present genuine issues that were properly presented to the jury, I would affirm the jury's holding that Curtis Nelson is guilty of murder. Therefore, I respectfully dissent.

While I agree with the majority's checklist consisting of eight facts established by the evidence in this case, I would add the following two significant facts to the list: (9) semen taken from the decedent's body excluded 95% of the black males, but failed to exclude the defendant and (10) defendant described to a friend exactly how decedent died a few weeks prior to her death.

In *Parker v. State*, 606 So. 2d 1132 (Miss. 1992), a case very similar to the case *sub judice*, this Court held:

> On a question of overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only when the verdict of the jury is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will we disturb that verdict on appeal.

606 So. 2d at 1140 (citations omitted). Nelson asserts there was no evidence of motive presented to the jury. Contrary to these assertions, there was evidence of motive and opportunity as well as a pattern of threats and harassment. Further, there was a fresh wound on Nelson's thigh made by the same type weapon used to brutally stab Evans to death. Finally, the semen could not exclude Nelson from having had sexual intercourse with Evans immediately prior to her death.

Moreover, there was evidence of Nelson lying as to his harassing and threatening Evans. And the evidence is very clear that Nelson continued to try to see Evans even though she continued to protest his coming around her, her children, or her house. Therefore, there was sufficient evidence to find Nelson guilty of murder of Georgia Mae Evans.

Moreover, this Court has held that:

> [I]f there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Gavin v. State,* 473 So. 2d 952, 956 (Miss. 1985); *May v. State*, 460 So. 2d 778, 781 (Miss. 1994); *see also Winters v. State*, 449 So. 2d 766 (Miss. 1984). The evidence, when viewed in the light most favorable to the State, supports the jury's verdict. *Norman v. State*, 385 So. 2d 1298, 1300-01 (Miss. 1980). This assignment of error is, therefore, without merit and I would respectfully dissent.

**ROBERTS, SMITH AND MILLS, JJ., JOIN THIS OPINION.**

1. Specifically, the letter stated:

He had nerve enough to call be (sic) back and say you don't have a damn soul. No. Because he want to be back just like I -- [scratch out]--wanted if I can't have you, wanted (sic) nobody have you.