## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-DP-00825-SCT

*BRYAN JOSEPH KOLBERG*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/13/90 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TRAVIS BUCKLEY |
| | CLIVE A. STAFFORD-SMITH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MIKE MOORE, MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | REVERSED AND REMANDED - 12/8/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/31/97 |

**EN BANC.**

**PITTMAN, JUSTICE, FOR THE COURT:**

¶1. On October 11, 1988, Bryan Kolberg ("Kolberg") was indicted in the First Judicial District of Hinds County Circuit Court for the capital murder of Madison Watson in violation of Miss. Code Ann. § 97-3-19(2)(f) (Supp. 1988). The alleged crime of child abuse occurred on August 19, 1988, resulting in Madison's death on August 24, 1988. The preliminary hearing was held on November 19, 1990, and the case went to trial on December 3, 1990.

¶2. Bryan Kolberg moved to Jackson, Mississippi, in January 1988. He met Laurel Watson and her twenty-two month-old daughter, Madison. At the end of June or the beginning of July 1988, Kolberg moved in with Laurel and Madison at 3347 ½ Whitten Road. Prior to August 19, 1988, Madison

began to have a lot of "accidents" while in the care of Kolberg. Kolberg explained all of them away as the child's clumsiness.

¶3. The week of August 19, 1988, Kolberg stayed at home from work while recuperating from a painful dental operation. He insisted that Madison stay with him instead of going to her normal baby sitter, Morina Jacobs. The evidence showed that on August 19, 1988, Kolberg was the only person who was in charge of Madison. That morning Kolberg and Madison drove Laurel to work. Afterwards, Kolberg and Madison returned home until approximately one o'clock. At that time Kolberg took Madison to see Laurel at work. During this lunch hour, Madison was playful and normal as any other twenty two month-old baby.

¶4. Kolberg returned home with Madison and put her down for a nap while he watched television in the other room. He testified that he heard a thump, and went in to check on Madison. She had fallen off the bed and was lying on the floor. So, Kolberg put her back in bed and propped a pillow in such a way as to stop her from falling again. He testified that she whimpered a little before falling back to sleep.

¶5. Later, Kolberg went into the room to wake Madison and could not do so. He then took the time to dress Madison and take her to the hospital. On the way to the hospital, he stopped and informed Morina Jacobs' children that Madison was hurt really bad. Next, he stopped to get gas and ask directions to the hospital. Once at the hospital, Kolberg called Laurel and told her Madison would not wake up so he had brought her to the hospital. Laurel then came to the emergency room. In the emergency room, Kolberg told the doctors that Madison had fallen. The doctors diagnosed Madison with massive head injuries which, in their opinion, were inconsistent with the history given by Kolberg.

¶6. Kolberg told the doctors and others that Madison sustained the head injury by slipping while getting into her high chair earlier that day and falling off the bed later that afternoon. However, Madison had sustained massive head trauma including subdural and subgaleal hematomas. Medical testimony described Madison's injuries as the type usually seen in a head on automobile collision, or a fall from a two- or three-story building, or being severely beaten with a bat-like object. Kolberg contends that Madison died of previous injuries that were accelerated by the fall off the bed or in the alternative that the injuries leading up to Madison's death were inflicted a week before she went into the hospital.

¶7. Doctors struggled to save Madison's life, but their efforts were in vain. After languishing in a coma for five days, Madison died from massive brain swelling on August 24, 1988.

¶8. After a trial, a jury of Kolberg's peers found him guilty of the capital murder of Madison Watson while engaged in child abuse. Kolberg was sentenced to death by lethal injection and February 7, 1991, was set as the date for execution of the sentence. This sentence was stayed on motion of the defendant on January 8, 1991.

¶9. Kolberg filed a Motion to Allow Filing of Post-Trial Motions After Preparation of Transcript on December 19, 1990. Kolberg then filed a Motion for New Trial on December 20, 1990. On January 8, 1991, the trial court entered an order allowing Kolberg to file his post-trial motions after the preparation of the transcript. The transcript was filed by the court reporter on May 28, 1991.

Kolberg filed a 59-page Amended Motion for New Trial on February 4, 1992. The trial court on January 28, 1993, held a hearing on the motion for new trial. The trial court on June 11, 1993, denied the motion for a new trial. Kolberg, aggrieved by the decisions of the lower court, timely filed his Notice of Appeal with this Court on July 19, 1993.

¶10. Kolberg asserts that an error was committed by the lower court that requires this Court to remand for a *Batson* hearing. The trial judge ignored the holding of *Powers v. Ohio*[1] by not recognizing that Kolberg had standing to assert a *Batson* challenge. It was error not to compel the prosecution to give race-neutral reasons for its peremptory challenges. Kolberg also objects to the testimony of Dr. Cartwright as privileged under the psychotherapist- patient privilege. The privilege did exist and the lower court erred in allowing this testimony.

¶11. In a case almost identical to the one at bar, we held that the lower court should have granted a manslaughter instruction to the defendant when charged under the same statute under which Kolberg was charged. *Butler v. State,* 608 So. 2d 314 (Miss. 1992). Thus, the lower court erred in denying the manslaughter instruction.

¶12. A discovery violation was raised on appeal. Kolberg asserts that the District Attorney violated the rules of discovery when it withheld certain information to which Dr. Vise and Dr. Galvez would later testify. This is a violation of Rule 4.06. The court erred when it failed to recognize this discovery violation and overruled Kolberg's objections and motions for a continuance and mistrial.

¶13. A number of other issues were raised by Kolberg. However, this Court will address only those which require reversal or discussion on the merits.

### I. WHETHER THE CASE MUST BE REVERSED AND RENDERED SINCE THE EVIDENCE DOES NOT EXCLUDE THE REASONABLE POSSIBILITY THAT NO CRIME OCCURRED AT ALL IN THIS CASE.

¶14. Kolberg asserts that the State did not produce enough evidence to sufficiently support the verdict of the jury. It is his contention that the State did not prove Kolberg guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.

¶15. The State counters that the proof was sufficient and that any review by this Court must be initiated in all deference to the verdict returned by the jury. The State relies upon *Maiben v. State*, 405 So. 2d 87 (Miss. 1981), where we stated that:

> We have held in numerous cases that the jury is the sole judge of the credibility of the witnesses and the weight to be attached to their testimony. We have further said **that we will not set aside a guilty verdict, absent other error, unless it is clearly a result of prejudice, bias or fraud, or is manifestly against the weight of credible evidence.** *Cromeans v. State*, 261 So. 2d 453 (Miss. 1972); *Marr v. State,* 248 Miss. 281, 159 So. 2d 167 (1963); and *Freeman v. State, supra*.

*Maiben,* 405 So. 2d at 88 (Miss. 1981) (emphasis added). In the case *sub judice,* the weight of credible evidence supports the jury verdict.

¶16. During its case-in-chief, the State had no less than five different medical personnel testify that

the child could not have been injured the way that Kolberg claims she was. James Donald, the nursing supervisor at Hinds General Hospital(Hinds General), testified that the injuries were inconsistent with the defendant's explanation of the injuries. Donald also stated that Kolberg had sole custody the day the injuries were inflicted.

¶17. Dr. Brent Meador was the family physician who saw Madison in the emergency room and at Hinds General. He stated that a fall from a bed could not result in the injury that Madison had sustained and that eventually killed her. Dr. Meador stated that the injuries were inconsistent with a fall onto a floor and that a fall off the bed would not have caused any of Madison's injuries. He testified that the injuries Madison sustained were consistent with falling from about forty feet, being hit with a bat, kicked very hard or possibly from a fist and that this was the type of damage that would occur in a high speed automobile accident. When asked if the massive head trauma could be explained by earlier injuries, the doctor emphatically stated that it could not have been the result of earlier injuries. It was the testimony of Dr. Meador that the injuries were inflicted on August 19, 1988, and at 4:30 p.m. the injuries were three to four hours old.

¶18. Dr. Stone, the emergency room physician, confirmed this point when he testified that the injuries were so severe that Madison could not have sustained significant blows to the head over a several day period. Doctors Meador, Galvez, Vise and Stone all testified that the blows to the back of the head were caused the afternoon Madison was admitted to the hospital, and they were in no way attributable to any accident. Dr. Stone also testified that a fall from a bed would not cause the injuries Madison had. He stated that the defendant's story was totally inconsistent with the injury to the back of Madison's head.

¶19. A neurosurgeon, Dr. Vise, was called into the case. It was his testimony that the injury was most unlikely to result from a fall from a highchair or bed. Dr. Vise stated that after this type injury it would be obvious that the person was dying. This testimony is inconsistent with Kolberg's story that Madison fell, then whimpered a little bit and went back to bed. Dr. Vise testified that the injuries occurred that day she was brought in, and the time frame was locked in. It is undisputed that Kolberg was the one who had sole custody of Madison that day. Furthermore, Dr. Vise testified that Madison had injuries that were typical signs of child battery.

¶20. Dr. Galvez, an expert pathologist and psychiatrist, also testified that Madison was definitely a battered child. It was the testimony of Dr. Galvez that Madison's death was caused by multiple blows to the head which caused the brain to swell and protrude into areas where it is not supposed to go. As the previous doctors had stated, he testified that the injuries to Madison were inconsistent with a fall from a bed or highchair.

¶21. Kolberg relies upon his own expert, Dr. Gilchrist, who stated that it was possible for a child to sustain a relatively minor blow to the head and die. However, Dr. Gilchrist also stated that Madison died from the swelling of the brain. He further stated that the book upon which Dr. Galvez relied mentions that a minor blow may inflict a fatal injury. On cross-examination, Dr. Gilchrist agreed that a child could not stay awake more than several hours after a traumatic injury such as Madison had suffered. He testified in response to the prosecution's questions that the reasonable medical probability was that the injury was sustained the day that Madison was admitted to the hospital. This is consistent with the testimony of the State. The overwhelming evidence presented by the State

refutes Kolberg's story about what really happened.

¶22. Kolberg "hangs his hat" on one case, *Steele v. State*, 544 So. 2d 802 (Miss. 1989). In *Steele***,** the defendant had custody of the child for one and a half hours the day the child was admitted to the hospital. The testimony in that case determined that the fatal injury could have been sustained any one of three days prior to the child's admission. In contrast, the testimony at Kolberg's trial was conclusive that the injury occurred the day Madison was admitted to the emergency room and Kolberg was the only person who had been with Madison that day. Only Dr. Gilchrist was able to say that the injury possibly was inflicted the day before Madison was admitted. However, it should be noted that he testified that it was most likely that the injury was inflicted on the day she was admitted. The probability that it was inflicted a day before is slight and there was only a possibility that it could have been done two days before. The State's testimony was all in accord with the date of the indictment being the day of admittance. In *Steele*, the circumstantial evidence was not sufficient for a conviction because a number of people had the child in custody during the time frame for the injury, unlike the present case. Although a reasonable possibility existed in *Steele*, no such possibility existed here. Thus, the evidence in the case at bar was sufficient to sustain the jury's verdict of guilty of capital murder and this claim is without merit.

### II. WHETHER BRYAN KOLBERG WAS DENIED A FAIR TRIAL BECAUSE THE STATE ABUSED TEN OF TWELVE PEREMPTORY CHALLENGES TO STRIKE BLACK JURORS IN VIOLATION OF *BATSON V. KENTUCKY* AND *POWERS V. OHIO*.

¶23. In the case at bar, the State had twelve peremptory challenges to use. It used most of the twelve on black jurors. A *Batson* challenge was made at trial, but the judge said that Kolberg did not have standing to challenge the peremptory challenges because he was not black. Subsequently, *Powers v. Ohio* was decided by the United States Supreme Court, holding that white defendants did have standing to challenge blacks being struck from the jury. At the Motion for a New Trial, Kolberg again brought up the *Batson* issue. The judge again overruled the objection without requiring the State to produce racially-neutral reasons for striking the ten black jurors through peremptory challenges.

¶24. Realizing the importance of credibility and first-hand observation, this Court has adopted a standard of review for *Batson* claims that accords "great deference" to a trial judge's factual findings, reversing only where the finding of the lower court was clearly erroneous or against the overwhelming weight of the evidence. *Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987).

¶25. To make out a prima facie case of discrimination in the exercise of peremptory challenges,

> the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida,* supra, at 494, and that the prosecution has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of mind to discriminate." *Avery v. Georgia,* 345 U.S., at 562. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venireman from the petit jury on account of their race.

*Batson v. Kentucky,* 476 U.S. 79, 96 (1986). The United States Supreme Court broadened the first prong of *Batson* in *Powers v. Ohio,* 499 U.S. 400 (1991), by holding that a white defendant has standing to challenge the exclusion of prospective black jurors.

¶26. Once a prima facie case has been made, the prosecution must supply racially-neutral reasons for using peremptory challenges on minority members. *Bush v. State,* 585 So. 2d 1262, 1268 (Miss. 1991), *aff'd after remand,* 597 So. 2d 656 (Miss. 1992)( *citing Batson v. Kentucky,* 476 U.S. 79, 98 (1986)). The degree of justification required does not rise to the level required for challenges for cause. *Bush,* 585 So. 2d at 1268 (*citing Benson v. State,* 551 So. 2d 188, 192 (Miss. 1988); *Wheeler v. State,* 536 So. 2d 1347, 1351 (Miss. 1988)). The defendant may then rebut the reasons offered by the prosecution. *Bush,* 585 So. 2d at 1268(*citing Taylor v. State,* 524 So. 2d 565 (Miss. 1988)).

¶27. The State argues that Kolberg cannot meet the three-prong test of *Batson* as adopted by this Court in *Govan v. State,* 591 So. 2d 428 (Miss. 1991). It was the conclusion of the lower court, and is now the State's contention, that Kolberg fails the first prong because he is white. This absolutely ignores the Supreme Court's holding in *Powers*. Thus, the lower court was in error and this argument by the State must fail.

¶28. Finally, the State provides race-neutral reasons for each peremptory challenge minus one. However, these reasons are "a day late and a dollar short." This Court can not review whether a trial judge abused his discretion when race-neutral reasons were never presented to the trial judge and he never exercised his discretion in considering the *Batson* challenge. It was error for the lower court not to require the prosecution to state race-neutral reasons at the trial level or possibly at the hearing on Motion for a New Trial.

¶29. Kolberg may have presented a prima facie case of discrimination. In *Chisolm v. State,* the defendant "made a prima facie showing meeting the *Batson* criteria" when the record reflected that the State had exercised seven of twelve peremptory challenges to exclude blacks from the jury. *Chisolm v. State,* 529 So. 2d 630, 632 (Miss. 1988). In the case *sub judice,* the prosecution used most of its challenges on blacks. However, the defense did not even have an opportunity to prove evidence of a prima facie *Batson* challenge because the lower court held that Kolberg did not have standing to raise the issue. Thus, the lower court should have provided Kolberg with an opportunity to make a case. If the defense was successful, the State should have been required to produce racially-neutral reasons for these challenges.

¶30. In a case almost factually identical to the one at bar, we held that a *Batson* hearing must be held to elicit racially-neutral reasons from the prosecution. *Thorson v. State,* 653 So. 2d 876, 896 (Miss. 1994). In *Thorson,* there were thirteen blacks on the venire and the State exercised seven peremptory challenges on blacks. *Id.* at 895. When the defense raised a *Batson* challenge, the court overruled it. The court stated that since the defendant was not a minority, the *Batson* criteria were not met. *Id.* Just as in Kolberg's case, four blacks were on the jury despite the prosecution's abuse of peremptory challenges. On Thorson's appeal, we held that "[c]ontrary to the court's ruling, the State was required under *Powers v. Ohio,* 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411(1991), to give racially neutral reasons for peremptorily challenging the seven blacks from the venire under the *Batson* criteria." *Thorson,* 653 So. 2d at 895 (footnote omitted). We noted that the trial court should not be

criticized for its ruling because, just as in the case at bar, ***Powers*** was not handed down until after the ***Thorson*** trial. However, we recognized that ***Powers*** will apply retroactively to cases on direct appeal. ***Thorson,*** 653 So. 2d at 895 n.8.

> While great deference is given the circuit court in its ruling on whether a satisfactory explanation has been offered, **it is nonetheless imperative that the State be required to offer a racially-neutral explanation for its peremptory challenges** . Because none was given, we hold this was error, and that a ***Batson*** hearing must be conducted.

***Thorson,*** 653 So. 2d at 895-96 (citations omitted) (emphasis added).

¶31. We would reverse and remand for a ***Batson*** hearing but for the following findings of this Court. In light of the reversible error contained within this case, a ***Batson*** hearing is not sufficient to save the trial of Kolberg. However, on retrial, the trial court should be aware of ***Powers*** and not foreclose the opportunity of a ***Batson*** challenge to Kolberg.

### III. WHETHER MICHAEL CARTWRIGHT SHOULD HAVE BEEN CALLED TO GIVE SPECULATIVE CHARACTER EVIDENCE IN VIOLATION OF THE COUNSELOR-PATIENT PRIVILEGE.

¶32. Kolberg asserts that the lower court erroneously allowed Michael Cartwright to testify to the sessions he had with Kolberg. During both the trial and the hearing on the motion for a new trial, Kolberg objected to Cartwright's testimony as privileged pursuant to Rule 503 of the Mississippi Rules of Evidence. However, Cartwright was allowed to testify as to the substance of the sessions he had with Kolberg.

¶33. The State argues that Cartwright was not a licensed psychologist and therefore, no psychologist-patient privilege could even exist. The fact that Cartwright is not a licensed psychologist is the entire basis for the State's position that no privilege existed. Unfortunately, the State does not read the rule in its entirety.

¶34. Mississippi Rule of Evidence 503 reads in pertinent part as follows:

**(a) Definitions.** As used in this rule:

(1) A *"patient' is* a person who consults or is examined or interviewed by a physician or psychotherapist.

(2) A *"physician"* is a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be.

(3) A *"psychotherapist" is* (1) a person authorized to practice medicine in any state or nation, **or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition,** including alcohol or drug addiction, or (2) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged.

(4) A communication is *"confidential"* if not intended to be disclosed to third persons, except

persons present to further the interest of the patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

**(b) General Rule of Privilege.** A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

Miss. R. Evid. 503(emphasis added). This rule of evidence defines psychotherapist not only by those persons who are licensed, but also by the subjective impressions of the patient. The court below focused on whether Cartwright was licensed and how he was supposedly introduced to Kolberg. However, Kolberg testified that he believed Cartwright to be a psychiatrist or psychologist. He believed that anything he told Cartwright was confidential. The following exchange occurred between Kolberg and his lawyer, Mr. Buckley, during trial.

Q. Did you have any reason to believe that what you had told him would be confidential or would not be disclosed?

A. I would think so. It should be. You know, if you're a psychologist, doctor or whatever, I would think that information that I talked to him about should be just between me and him.

. . . .

[W]hen I went to see him I thought he was a psychologist or psychiatrist.

Thus, under a literal reading of the rule, a patient-psychotherapist relationship and privilege did exist between Kolberg and Cartwright. The lower court erroneously admitted the testimony of Cartwright.

¶35. The lower court overruled the objections made by defense counsel, stating that:

[B]ased upon the representations of the State and of the Defense Counsel that the person conducting the interview was not licensed in the State of Mississippi as a psychiatrist or a psychologist, nor was he represented to the defendant as functioning in that capacity during the time of their conversations.

This ruling was based upon a report made by a detective who interviewed Cartwright. When asked how he represented himself to Kolberg, Cartwright said "he represented himself to the defendant as a counsellor [sic], not a psychologist and not a psychiatrist." However, the rule does not base the privilege upon how the "counselor" represents himself to the patient, but rather focuses on the reasonable belief of the patient. *See* Miss .R .Evid. 503(a)(3). Moreover, in *Everett v. State,* 572 So. 2d 838 (Miss. 1990), this Court tacitly recognized the privilege flowing to a defendant who had consulted a mental health therapist by holding that the privilege had been waived by the defendant's request to the therapist to write the court on the defendant's behalf. Thus, the lower court committed

reversible error in admitting the testimony of Cartwright.

### IV. WHETHER UNDER THE RULE OF *BUTLER V. STATE* IT WAS ERROR FOR THE JURY TO BE INSTRUCTED ON CAPITAL MURDER IN THE COURSE OF CHILD ABUSE, BUT NOT THE IDENTICAL ELEMENTS OF FELONY MANSLAUGHTER.

¶36. Reversible error was committed by the trial court when it did not allow any manslaughter instructions to be given to the jury. Kolberg relies upon *Butler v. State*, 608 So. 2d 314 (Miss. 1992). In *Butler,* we reviewed an anomaly in our murder statutes. The elements of capital murder during the course of felonious child abuse, *see* Miss. Code Ann. § 97-3-19(2)(f), are indistinguishable from the elements of felony manslaughter. *See* Miss. Code Ann. § 97-5-39(2) (1972). This anomaly existed at the time of Kolberg's trial and at the time of Butler's trial. The State concedes this area of error, yet attempts to fend it off by noting that the "Legislature has now corrected the oversight it created when it passed the statute defining capital murder. This will not be a question in the future." This argument is untenable. The fact that the Legislature has solved a problem which will not occur in the future cannot be a reason to ignore the problem in a trial conducted before the Legislature voted to correct the problem.

¶37. We stated in *Butler* "that Butler was entitled to have the jury instructed that she could be convicted under Miss. Code Ann. § 97-3-27, the manslaughter statute." Id. The case *sub judice,* is almost factually identical to the *Butler* case. In both cases the defendant was charged with capital murder during felonious child abuse. However, Kolberg was not allowed the felony manslaughter instruction. The jury in the present case had two choices: capital murder or acquittal. When faced with the identity of the elements of capital murder and felony manslaughter, the lower court was not sure "that the Court has any option than to say you either find him guilty of the statute that he's charged under or you don't find him guilty at all." This, however, is contrary to what we held in *Butler*.

> It is not an even-handed administration of justice in turn to deny the defense a manslaughter instruction where the accused, as is the case here, could have been lawfully indicted and prosecuted for manslaughter as easily as capital murder. And especially is this true where one verdict can bring a sentence of death and the other a maximum of twenty years imprisonment.

*Butler,* 608 So. 2d at 320.

¶38. We further opined that this holding was "fortified in that Miss. Code Ann. § 99-17-20 (Supp. 1991), a criminal procedure statute in capital murder cases, contains a provision authorizing such an instruction." *Id.*

¶39. The State counters that *Butler* should not be applied retroactively. It noted that *Butler* was reversed on other grounds and thus, the rule regarding manslaughter instructions should be prospective only.[2] In support of this argument, the State cites *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), *cert. denied*, 513 U.S. 927 (1994). Unfortunately for the State, the case at bar is readily distinguishable from *Conner*. In the latter case, the rule in controversy was enunciated in a later case and specifically designated as "purely prospective" in nature. *Conner,* 632 So. 2d at 1269. Thus, we did not apply it in *Conner.* However, no such label was given to the rule stated in *Butler*.

¶40. We have previously noted that "[t]his Court has addressed the issue of retroactive application of new rules of law many times. 'It is a general rule that judicially enunciated rules of law are applied retroactively.'" *Ales v. Ales*, 650 So. 2d 482, 484 (Miss. 1995) (*quoting* *Hall v. Hilbun*, 466 So. 2d 856, 875 (Miss. 1985)). Our statement of retroactive application is agreeable with the United States Supreme Court. "As a rule, judicial decisions apply 'retroactively.'" *Solem v. Stumes*, 465 U.S. 638, 642 (1984) (*quoting* *Robinson v. Neil*, 409 U.S. 505, 507-508 (1973)). Thus, Kolberg correctly stated that *Butler* should apply retroactively and Kolberg should have been given a manslaughter instruction.

¶41. Kolberg notes the overwhelming prejudicial effect that this error had in the case at bar. The jury ultimately found that Kolberg had caused the death, but they did not find that he had either attempted to kill the child, or intended that it should happen. Thus, it is apparent that the jury found the elements of the crime of manslaughter. However, they were not given that option at the guilt phase because the trial court erroneously refused to give a manslaughter instruction.

¶42. The rule enunciated in *Butler* should be applied and therefore, the lower court erred in denying the manslaughter instruction.

## V. WHETHER THE PROSECUTION COMMITTED DISCOVERY VIOLATIONS WHICH GRAVELY PREJUDICED BRYAN KOLBERG.

¶43. Kolberg alleges two discovery violations due to evidence that was withheld by the prosecution from the defense. This evidence includes the testimony of Dr. Vise that there was a basal skull fracture and the testimony of Dr. Galvez that slides had been taken during the autopsy to age bruises and injuries. Pursuant to the Uniform Criminal Rules of Circuit Court Practice Rule 4.06:

(a) Upon written request by the defendant, the prosecution **shall disclose** to each defendant or to his or her attorney, and permit him or her to inspect, copy, test, and photograph, without the necessity of court order, the following which is in the possession, custody, or control of the State, or the existence of which is known, or by the exercise of due diligence may become known, to the prosecution:

(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved, of each such witness and **the substance of any oral statement made by any such witness.**

Unif. Crim. R. Cir. Ct. Practice 4.06 (emphasis added). The State did not tell Kolberg that Dr. Vise would testify that there was or might be a basal skull fracture, nor did it reveal that slides of the tissues, etc., had been taken at the autopsy by Dr. Galvez.

¶44. This Court has reiterated the guidelines set forth in Rule 4.06 on the procedure for when the prosecution attempts to admit evidence that was not timely disclosed. *See Holland v. State,* 587 So. 2d 848 (Miss. 1991); *Cole v. State*, 525 So. 2d 365 (Miss. 1987), *cert. denied, Cole v. Mississippi*, 488 U.S. 934 (1988); and *Box v. State,* 437 So. 2d 19 (Miss. 1983). First, the court should allow the defense an opportunity to review the evidence. Unif. Crim. R. Cir. Ct. Practice 4.06(i)(1). Second, if the defense "claims unfair surprise or undue prejudice and seeks a continuance

or mistrial," the court should exclude the evidence, grant the continuance, or grant a mistrial. Unif. R. Cir. Ct. Practice 4.06(i)(2). And, finally, the court will not be required to grant a continuance or mistrial if the State withdraws the evidence or ceases to attempt to have it admitted. Unif. R. Cir. Ct. Practice 4.06(i)(3).

¶45. The State correctly recites the proper procedural steps to object to a discovery violation. Subsequently, it argues that Kolberg did not request a continuance as required by the rules and this Court's rulings. However, the record reflects that such a motion was made by Kolberg's attorneys. The trial judge did not recognize that a discovery violation had been made and held that "the motion for continuance is overruled and the motion for a mistrial is overruled." Thus, the State's argument that Kolberg did not follow the *Box* rules is without merit and must fail. It is inane to require a defendant to follow the rules set forth in *Box* for the procedure to make a discovery violation objection when the judge has ruled that there was no discovery violation.

¶46. Contrary to the lower court's ruling, there was a violation of the discovery rules by the State. District Attorney Peters admitted that he knew of the basal skull fracture issue: "If they wanted to know that, all they had to do was the exact same thing I did, which was to walk up and ask this doctor, 'Was there a basal skull fracture?' The first thing he told me was, 'In all likelihood, there was.'" The rules of criminal procedure in Mississippi do not require the defendant to ask about questions he had no idea he should ask. However, the rules do require the prosecution to produce the "substance of any oral statement made by any such witness" to the defense. Unif. R. Cir. Ct. Practice 4.06(a)(1). This Court has previously held that knowledge of an oral statement is no excuse for violating the discovery rule.

> The prosecution's response is . . . that [the doctor] . . . had prepared no report or other writing concerning the matter and, therefore, "there was nothing to produce in discovery . . . . The fact that [the doctor] had furnished no written report is not grounds for non-disclosure. In other contexts where written statements or reports were discoverable, we have held that the duty to make discovery extends to unwritten statements and reports as well.

*West v. State,* 553 So. 2d 8, 16 (Miss. 1989).

¶47. The DA's Office in the Seventh Circuit District apparently has a disdain for our rules of discovery: they often seem to ignore or skirt the requirement of discovery. If this seemingly deliberate attempted avoidance of discovery continues in this district, this Court will consider sanctions, including consideration of assessing the cost of trial against those who ignore this important and fair rule. In the case at bar, District Attorney Peters failed to produce any information about the oral statements made by this witness and the slides used by Dr. Galvez. This is a violation of the discovery rules. If the district attorney does not provide the evidence to the opposing counsel during discovery, then it should not be introduced as evidence in the trial. Consequently, the lower court erroneously denied the motion for a continuance and mistrial. The testimony of Dr. Vise concerning a basal skull fracture and Dr. Galvez concerning the microscopic slides was improperly admitted. The lower court again committed reversible error.

### VI. WHETHER BRYAN KOLBERG WAS ALLOWED HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO A SPEEDY TRIAL AND A SPEEDY APPEAL.

**A. The denial of the right to a speedy trial.**

¶48. Kolberg argues that his trial was unreasonably delayed far beyond the 270 days allowed by statute and that his constitutional right to a speedy trial was also violated.

### *Statutory Right to a Speedy Trial*

¶49. The docket within this record reflects that all continuances except one was requested and granted to Kolberg's counsel. The remaining one was a proposed agreed continuance from September 9, 1990, until December 3, 1990. This Court, in *State v. Harrison,* 648 So.2d 66, 69 (Miss. 1994), stated:

> Since *Turner,* however, this Court has found a handful of circumstances where the 270-day provision was not violated even though no written order of continuance appears in the record. *Arnett v. State,* 532 So.2d 1003, 1010-11 (Miss. 1988)(where counsel for State and defendant orally agree to continuance without written order in record, clock stops for purposes of 270-day rule).

¶50. In fact, most of the delay was occasioned by Kolberg's own motions or inaction. Much of Kolberg's concerns dealt with his dissatisfaction with his own counsel. When all of this time is calculated, Kolberg was in fact tried in less than eight months after arraignment, thus there is no presumed prejudice. *Spencer v. State,* 592 So.2d 1382, 1387 (Miss. 1991); *Smith v. State,* 550 So.2d 406, 408 (Miss. 1989).

¶51. This Court has, in fact, established a procedure for determining when prejudice to a defendant exists. In *Harrison*, this Court stated:

> We hold that dismissal with prejudice is not required by the statute unless the state upon the finding of a violation fails to persuade the court that the violation did not prejudice the defendant's ability to defend against the charge and that the state did not deliberately engage in oppressive conduct.

*Harrison,* 648 So.2d at 71. This Court determined that the remedy was "dismissal without prejudice to reindictment" and remanded the case to the lower court for a hearing for "a determination whether Harrison has been prejudiced by the delay incurred prior to dismissal and whether the state in delaying trial was deliberately engaging in oppressive conduct." *Harrison,* 648 So.2d at 71. Here, Kolberg has not alleged oppressive conduct by the State. To the contrary, the State has adequately demonstrated that there was no prejudice to Kolberg in defending against the charge and no oppressive conduct engaged in by the State. The bulk of the delay was in fact caused by Kolberg. There is no statutory violation of Kolberg's speedy trial rights.

### *Constitutional Right to a Speedy Trial*

¶52. Turning to the question of whether there was a constitutional violation of Kolberg's speedy trial rights, we apply the *Barker* factors. *Barker v. Wingo,* 407 U.S. 514, 530 (1972). Since Kolberg was indicted on October 11, 1988, and tried on December 3, 1990, a delay of almost twenty -six months, prejudice is presumed, thereby triggering inquiry into the other factors. *Spencer v. State,* 592 So.2d 1382, 1387 (Miss. 1991).

¶53. Considering the second *Barker* factor of cause of delay, most was due to Kolberg and should weigh heavily against him. Certainly one cannot say from a reading of this record that the State made any deliberate attempts that could be considered as oppressive conduct that in any way could harm the defense. Any delay here was for good cause.

¶54. Kolberg's first assertion of his right to a speedy trial was made on October 22, 1990, forty-one days before trial. Kolberg included the speedy trial claim in a Motion to Dismiss the Indictment in which the main focus was the failure to transcribe some of the proceedings while Kolberg was represented by his original trial counsel. In *Perry v. State,* 637 So.2d 871, 875 (Miss. 1994) (*citing Adams v. State,* 583 So.2d 165, 169-70 (Miss. 1991)), this Court stated, "[A] demand for dismissal for violation of the right to speedy trial is not the equivalent of a demand for speedy trial. . . . [W]e held that a demand for dismissal coupled with a demand for an instant trial was insufficient to weigh this factor in favor of the defendant . . . ." Therefore, in the case *sub judice*, such dilatory assertions should weigh against Kolberg. *See Barker,* 407 U.S. at 531-32.

¶55. In conclusion, we must examine whether Kolberg suffered prejudice occasioned by the delay. Kolberg does not claim that because of the delay witnesses scheduled to testify for the defense disappeared or that any evidence was lost or destroyed or any actual prejudice was incurred. There is no showing of Kolberg being prejudiced to an extent that he could not defend against the charge, nor is there any indication that the State engaged in oppressive conduct. Kolberg's claim of a violation of speedy trial rights is without merit.

### B. The denial of a speedy appeal.

¶56. Kolberg further argues that he was also denied a speedy appeal. He has been on death row, awaiting vindication of his rights, for almost five years. It took four years to file his brief; Kolberg states that it was due to no fault of his own, "but due to the indifference of the trial court in preparing his record." Kolberg states that in analyzing this claim, the courts have generally applied the same *Barker* factors to the right to a speedy and effective appeal as are applied to the right to a speedy trial. *See Cody v. Henderson*, 936 F.2d 715 (2d Cir. 1991); *Simmons v. Reynolds*, 898 F.2d 865 (2d Cir. 1990); *Burkett v. Cunningham*, 826 F.2d 1208 (3rd Cir. 1987); *Rheuark v. Shaw*, 628 F.2d 297 (5ᵗʰ Cir. 1980); *Doescher v. Estelle*, 454 F. Supp. 943 (N.D. Tex. 1978); *Gaines v. Manson*, 481 A.2d 1084 (Conn. 1984).

¶57. Kolberg asserts that his time delay is sufficient to violate his right to a speedy appeal. The State argues that Kolberg was the cause of the delay. It claims that Kolberg requested that he not have to file his post-trial motions until after the transcript was filed. He then took 252 days to file his amended motion for a new trial. Finally after hearing the motion, the court denied said motion 134 days later. The State contends that it is Kolberg's fault it took so long to hear and decide the motion because the record does not reflect him urging the court to do so.

¶58. The motion for a new trial was denied on June 11, 1993. The record was filed in this Court on December 2, 1993 (almost three years to the day from the start of Kolberg's trial). On January 5, 1994, Kolberg's attorney filed for an extension of time to February 10, 1994. On January 24, 1994, Kolberg's attorney filed a Motion for Supplementation of the Record. This suspended the briefing schedule. On April 21, 1994, we granted the Motion to Supplement the Record and remanded the

case to the Circuit Court of Hinds County for sixty days for the transcript of the motion for a new trial. Finally, on June 16, 1994, Kolberg's attorney wrote the circuit judge and asked that he order the record completed as soon as possible. Twelve days later, on June 28, 1994, the judge entered an order to have the motion for new trial transcribed.[(3)]

¶59. When Kolberg was finally able to file his brief, he also filed a Motion for Expanded Brief, again staying the briefing schedule. Forty-five days later, this Court granted the Motion for Expanded Brief. On December 13, 1994, the Office of the Attorney General received a notice from this Court that its brief would be due on January 12, 1995. The State requested and was granted continuances until April 14, 1995.

¶60. Kolberg asserts that the time it took to have the transcript prepared should count against the State and not him. Kolberg also asserts that the 359 days the judge took to schedule a hearing on the Motion for a New Trial should not be counted against him because he did request that it be scheduled. Further, Kolberg notes that it took the judge 134 days to enter an order denying his Motion for a New Trial when he had essentially ruled against him from the bench. It then took a year and a half -- from January 28, 1993, until September 6, 1994 -- to be filed in the Circuit Court. The transcript is only twelve pages long, thus, it took more than forty-eight days per page to transcribe. The State attempts to count much of this time against Kolberg. We cannot agree that this time should be counted against Kolberg. It is not a defendant's duty to run the court system efficiently.

¶61. The remedy for denial of a speedy appeal is not clear since this Court has never recognized such a right and does not do so now. Kolberg asserts that his claim should be dismissed with prejudice. The State asserts that the remedy is a civil suit for deprivation of his civil rights. Because this case is being reversed on other grounds, we shall not consider the issue at this time. Rather, we leave that decision for a later time when such consideration is required.

## CONCLUSION

¶62. The lower court committed reversible error requiring this case to be reversed and remanded. It was error to allow Dr. Cartwright to testify in spite of the counselor-patient privilege recognized in our rules of evidence. In light of the statute as it was written at the time of trial and the case of *Butler v. State*, it was also error for the court to refuse Kolberg his requests for a manslaughter instruction. The prosecution committed two discovery violations, neither of which the trial court recognized. Thus, "undiscovered" evidence was presented to the jury. Accordingly, the judgment of the lower court is reversed and remanded for a new trial.

¶63. **REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**SULLIVAN, P.J., AND BANKS, J., CONCUR. PRATHER, P.J., CONCURS IN RESULT ONLY. McRAE, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION. DAN LEE, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY SMITH, J. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ.**

## McRAE, JUSTICE, CONCURRING IN RESULT ONLY:

¶64. I agree that the proper resolution is to reverse and remand for a new trial. However, I must part ways with the majority in its conclusion that Kolberg's right to a speedy trial was not violated.

¶65. The facts in this case show that Kolberg's trial did not commence within 270 days of arraignment. Unless the State shows good cause and the court grants a continuance, offenses must be tried no later than 270 days after the defendant has been arraigned. Miss. Code Ann. § 99-17-1 (1994) ; *Vickery v. State*, 535 So. 2d 1371 (Miss. 1988). Between Kolberg's arraignment on February 2, 1989 and his trial on December 3, 1990, 449 days accrued against the State. Of those days, only 159 can suffice for good cause, based on an order by the lower court granting the State's motion for a continuance. The remaining delay goes unexplained. Because the State failed to carry its burden of proof to establish good cause for delay, Kolberg was denied his statutory right to a speedy trial. It is on this basis that I would reverse and remand.

## DAN LEE, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶66. I concur with the majority on Issues I and IV but must dissent to the majority's positions on Issues II, III, and V. I would reverse and remand on Issue IV alone.

¶67. Regarding Issue II, it was Kolberg's burden to preserve for appellate review any alleged mistakes made at trial; he did not. *See Smith v. State*, 572 So. 2d 847, 849 (Miss. 1990) (ruling of lower court presumed to be correct and defendant must show error in record that warrants reversal). *See also Batson v. Kentucky*, 476 U.S. 79, 96 (1986). Kolberg bore the responsibility to make the record in this case for his appeal. As to Issue II, Kolberg was under an obligation to make some proffer in the record of the racial make-up of the jury, and this was not done. Therefore, nothing exists in the record for this Court to review concerning whether a *Batson* violation occurred. Accordingly, this assignment of error is without merit and this issue should be affirmed.

¶68. As to Issue III, the majority is correct in holding that under M.R.E. 503(a)(3) a patient-psychotherapist relationship and privilege existed between Kolberg and Cartright. However, this privilege was waived by Kolberg when he released copies of Cartright's reports to Dr. O'Brien, Kolberg's expert witness, who used the reports in developing his expert opinion presented to the jury at trial. *Everett v. State*, 572 So. 2d 838 (Miss. 1991). M.R.E. 503(a)(4) provides:

> A communication is "confidential" if not intended to be disclosed to third persons, except persons present to further the interest of the patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

In addition, pursuant to M.R.E. 503(b):

A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

¶69. The majority looks to a close reading of the M.R.E. 503(a)(3) to counter the State's position that no patient-psychotherapist privilege existed. However, a closer reading of the Rules, specifically 503(a)(4) and 503(b), suggests that the trial court did not err in admitting the testimony of Cartright. Once Kolberg shared Cartright's reports with O'Brien, he waived his privilege. O'Brien's review of Kolberg's reports was not done for the purposes outlined in the Rules. I believe Dr. O'Brien's review and subsequent testimony was for the purposes of keeping Kolberg off death row, not for the purposes of "diagnosis or treatment". Therefore, this assignment of error is without merit and this issue should be affirmed.

¶70. The error addressed in Issue V pertains to possible discovery violations on the part of the prosecution and the testimony of Dr. Vise and Dr. Galvez. After hearing arguments from counsel, regarding a motion for continuance and a motion for a new trial, the trial court found that the State had done nothing improper and that Kolberg was not prejudiced by the witnesses' testimony. Even if one accepts that there may have been discovery violations, the violations do not rise to the level requiring a reversal of the conviction. In light of the testimony already in evidence when Dr. Vise and Dr. Galvez testified, the alleged discovery violations were harmless error at most.

¶71. Accordingly, I respectfully dissent as to Issues II, III, and V.

**SMITH, J., JOINS THIS OPINION IN PART.**

**SMITH, JUSTICE, DISSENTING:**

¶72. The majority finds numerous errors by the trial court supposedly sufficient to justify the reversal of Kolberg's sentence of death imposed by a Hinds County jury for the capital murder of twenty-two month old Madison Watson, the daughter of Kolberg's live-in girlfriend.

¶73. Kolberg attempted to explain the injuries suffered by Madison by claiming that she had slipped while getting out of a high chair and had fallen out of the bed. Such lame excuses were not convincing to the physicians who attempted to save Madison's life, nor were his stories convincing to the jury who decided that Kolberg was guilty of capital murder while committing child abuse and deserving of the death penalty. At trial, the physicians testified that Madison sustained massive head trauma, including subdural and subgaleal hematomas. Madison's injuries were consistent with those usually seen in a head-on automobile collision, being severely beaten with a bat-like object, or a fall from a two or three story building. Despite valiant efforts to save her, Madison was declared brain dead, remained in a coma for five days and finally died August 24, 1988. Because I do not share the majority's view that this case must be reversed, I am compelled to dissent.

**I.**

¶74. The first basis for the reversal is a violation of **Batson v. Kentucky**, 476 U.S. 79 (1986), as expanded in **Powers v. Ohio**, 499 U.S. 400 (1991), by the State in the exercise of its peremptory challenges. Kolberg claims that the State used ten of its twelve peremptory challenges on black jurors. The majority simply writes that the State "used most of the 12 on black jurors." *Majority* at 9. In fact, the record does not reflect the race of any juror. Kolberg cited only to his Motion for a New Trial and the statement by one of his attorneys, Clive Stafford Smith, in support of this argument. However, this is merely an unsupported allegation in a pleading, not evidence. Without evidence in the record to reflect the race of the jurors chosen, challenged, or excused, this Court cannot review this claim. In **Doby v. State**, 557 So. 2d 533 (Miss. 1990), this Court held:

> Second, and independently, it is the duty of the appellant to present a record of the trial sufficient to show that the error of which he complains on appeal has occurred and, further, that the error was timely and properly preserved. *See, e.g., **Queen v. Queen***, 551 So. 2d 197, 199 (Miss. 1989); **Peterson v. State**, 518 So. 2d 632, 638 (Miss. 1987); **Winters v. State**, 473 So. 2d 452, 457 (Miss. 1985); **Dorrough v. State**, 437 So. 2d 35, 37 (Miss. 1983).

**Doby**, 557 So. 2d at 536 n.2. *See also **Artis v. State***, 643 So. 2d 533, 535 (Miss. 1994); **Branch v. State**, 347 So. 2d 957, 958 (Miss. 1977). Kolberg clearly failed to present a sufficient record from which this Court could review this issue, yet, the majority elects to proceed.

¶75. Although I agree with the majority that the United States Supreme Court broadened the first prong of **Batson** in **Powers v. Ohio**, nevertheless, in the case at bar, no prima facie case was made on the **Batson** issue. This Court, in **Govan v. State**, 591 So. 2d 428, 429-30 (Miss. 1991), mandated a three-pronged test which defendants must meet. The majority correctly finds that Kolberg meets the first prong: that a white defendant has standing to challenge the exclusion of prospective black jurors. Yet, the majority fails to grasp the fact that Kolberg, as did the defendant in **Govan**, failed to "demonstrate such attendant facts and circumstances as would justify an inference that the prosecutor used peremptory challenges to purposefully exclude veniremen because they were black." **Id.** at 430.

¶76. The record reflects that the State used all twelve peremptory challenges, however, four black veniremen served on the jury. In determining whether purposeful exclusion of blacks from the jury occurred, this Court examines the number of strikes used and whether any blacks were accepted on the jury panel. **Dennis v. State**, 555 So. 2d 679, 681 (Miss. 1989); **Evans v. Cabana**, 821 F. 2d 1065 (5th Cir. 1987), *cert. denied,* 483 U.S. 1035 (1987). If the majority is going to proceed on this limited record which fails to identify the race of the jurors, why not also examine the record for any apparent reason by the State for striking the challenged jurors.

¶77. This Court can determine this issue if we accept, as the does the majority, the racial makeup of the venire as stated by defense counsel in the motion for a new trial. However, defense counsel Buckley, when objecting to the State's exercise of their peremptory challenges, claimed no identifiable basis for doing so and stated, "we feel it's particularly prejudicial in view of the fact that most of the people who were excused by the State were those who voiced strong objections to the death penalty, and they were of the black race." Thus, the objection by defense counsel to the jury panel recognized that no prima facie case was made.

¶78. Challenges by the State were based upon the juror's views on the death penalty, a perfectly

acceptable race neutral reason. This Court, in *Mack v. State*, 650 So. 2d 1289, (Miss. 1994), *cert. denied*, 116 S.Ct. 214 (1995) stated:

> Mack's argument that conscientious scruples against the death penalty is not a race-neutral reason for striking a prospective juror when a challenge for cause has been denied against that juror must fail. Opposition to the death penalty is not in the same suspect classification as race and is therefore, a race neutral reason. *Turner v. State*, 573 So. 2d 657, (Miss. 1990) citing *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed. 2d 137 (1986); *Johnson v. State*, 529 So. 2d 577, 584 (Miss. 1988) ("Scruples against the death penalty are clearly race neutral").

*Mack*, 650 So. 2d at 1300.

¶79. The record reveals no systematic exclusion of black jurors by the State. Moreover, defense counsel recognized that practically all of the jurors were challenged by the State on the basis of their views regarding the death penalty. The very purpose of voir dire of jurors regarding their views on the death penalty is to exclude those jurors who are determined to vote for or against a penalty of death in spite of the evidence introduced at trial or the instructions of law given to them by the trial court. This Court, in *Foster v. State*, 639 So. 2d 1263, 1277 (Miss. 1994), *cert. denied,* 115 S.Ct. 1365 (1995) stated:

> The overall objective of *Witherspoon* and the subsequent line of authority thereafter, *Wainwright, Adams,* and *Morgan* is to not allow jurors to serve who are steadfastly determined to vote for or against the death penalty despite the facts in evidence and the law on which they are instructed. The Fifth Circuit Court of Appeals in *Smith v. Balkcom*, 660 F. 2d 573, 578 (5th Cir. 1981), modified, 671 F.2d 858, cert. Denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed. 2d 148 (1982), stated:

> All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated-i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.

¶80. The *Foster* Court also noted that "[w]ithout exception the 'extremes' on the venire were eliminated." *Id.* at 1277. As in *Foster*, most of the excluded jurors were "extremes" with regard to their ability to be fair and impartial concerning the death penalty. Close examination of the record reveals that a reason for the State's strike of only one juror, Nezeree Moore, is not apparent. Striking one juror without any apparent reason in the record does not make out a prima facie case of racial discrimination. Other jurors struck by the State either had strong opposition to the death penalty or personally knew someone recently charged or convicted of a crime. The State properly used its challenges on these jurors. No prima facie case was made by Kolberg on this issue, therefore, I would affirm.

## II.

¶81. The second basis for the reversal by the majority is due to the admission of the testimony of Michael Cartwright, a counselor, under M.R.E. 503 (3)(1) (1990). M.R.E. 503(3)(1) defines a

psychotherapist as "a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, including alcohol or drug addiction."

¶82. However, the majority fails to acknowledge that it was Kolberg who gave a copy of Cartwright's report to his own expert witness, Dr. O'Brien, who, in turn, used Cartwright's report in forming his own expert opinion which was presented to the jury. It is also noteworthy that Dr. O'Brien's opinion was consistent with the report of Cartwright. It is my view that Kolberg waived any objection to Cartwright's testimony when he gave the report to his own expert who in turn based his opinion, in part, on the report. *Everett v. State*, 572 So. 2d 838, 840 (Miss. 1990).

### III.

¶83. The majority would reverse because the trial court failed to give a manslaughter instruction under authority of *Butler v. State*, 608 So. 2d 314 (Miss. 1992). *Butler* was decided on August 26, 1992. Kolberg's trial concluded on December 13, 1990. *Butler* should not be retroactively applied to the case at bar. It is also noteworthy that *Butler* was not reversed for failure to grant the manslaughter instruction, but rather, the reversal was due to prosecutorial comment on Butler's failure to testify. The *Butler* Court stated:

> These comments were reversible error, so egregious in fact that even if there had been no objection at trial we would nevertheless have been obligated to reverse. *Livingston,* 525 So. 2d at 1305-08. *Because we reverse on this ground, the remainder of the opinion is confined to questions likely to recur on retrial.* [emphasis added.]

*Butler*, 608 So. 2d at 319. Because *Butler* was not reversed on this ground, the rule announced regarding the failure to give the manslaughter instruction is one of "pure prospectivity" applicable only to cases tried after this Court's decision in *Butler*. In *Conner v. State*, 632 So. 2d 1239, 1269 (Miss. 1993), *cert. denied,* 115 S.Ct. 314 (1994)(*citing **Teague v. Lane**, 489 U.S. 288, 300 (1989)), this Court stated:

> Conner misses the point of *Teague*. The United States Supreme Court in *Teague* prohibited "selective prospectivity," *i.e.*, the practice of applying the new rule to the defendant in the case where the rule is announced but not to other defendants whose cases arose prior to the announcement. *Teague* in no way forbids the practice of "pure prospectivity," in which the new rule is applied neither to the defendant in the case where the rule is announced nor to other defendants whose cases arose before the new rule was announced.

*Conner*, 632 So. 2d at 1269. Because *Butler* was not reversed on the failure to grant the requested manslaughter instruction and Kolberg was tried long before this Court's decision in *Butler*, the ruling should not apply to the case at bar or to other defendants tried prior to August 26, 1992. I would affirm on this issue.

### IV.

¶84. Next, the majority reverses for failure of the State to provide discovery of certain testimony of Drs. Vise and Galvez. Admittedly, the better practice is for the State to fully disclose all evidence

intended to be offered during its case to the defense. Likewise, discovery is reciprocal by the defense. However, this Court, in **Harrison v. State**, 635 So. 2d 894, 898 (Miss. 1994), stated "[f]ailure to strictly comply with Rule 4.06 is not necessarily fatal." This Court has held that remedies for discovery violations are not self- executing and that an accused must request a continuance when the State is tardy in disclosure of discovery material. **Holland v. State**, 587 So. 2d 848, 866 (Miss. 1991) ; **Middlebrook v. State**, 555 So. 2d 1009,1011 (Miss. 1990); **Cole v. State**, 525 So. 2d 365, 368 (Miss. 1987); **Cabello v. State**, 471 So. 2d 332, 343 (Miss. 1985). Failure by the defense to request a continuance constitutes a waiver of the issue. **Box v. State**, 437 So. 2d 19, 23-26 (Miss. 1983) (Robertson, J., specially concurring). In the case at bar, what the majority claims is a motion for a continuance, appears to be merely a motion to exclude the evidence after it had been presented accompanied by a misstatement of the trial judge. The issue is waived.

¶85. I respectfully dissent.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. 499 U.S. 400 (1991).

2. Just because an error is not the basis of reversal in one case does not mean that it won't be the basis of reversal in another case; nor does it mean that the rule should be applied prospectively.

3. The hearing on this motion was held on January 28, 1993. At this hearing Kolberg's attorney asked that the transcript of that hearing be expeditiously transcribed. It was over a year later that the judge finally ordered the hearing to be transcribed.