SMITH, Justice,
for the Court:
On December 3, 1990, Willie H. Bankhead was convicted of voyeurism in the Circuit Court of Lowndes County. He was sentenced as an habitual offender to serve a term of five (5) years without parole under the supervision of the Mississippi Department of Corrections. Bankhead had a prior conviction for burglary. In tMs trial involving purely circumstantial evidence, the State had the burden of proving Bankhead’s guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. This the State failed to do. In light of the evidence presented, and the State’s failure to refute Bankhead’s reasonable version of the events in question, tMs Court is forced to order the conviction overturned.
PACTS
In February 1990, Mr. Toby Atkins lived with his wife at the Chanticleer Apartments in Columbus, Mississippi. On the evemng of February 6, Mr. Atkins testified he had just left his apartment to take out his garbage when he noticed a man on the upper deck of a neighboring apartment building looking into a window. Mr. Atkins stated that he knew the window to be a bathroom wmdow and that the man he observed “had Ms face right up there at the window.” He further described the person as a black male, wearing camouflage clothing, but stated that he did not see the man’s face. After seeing the person, Mr. Atkins stated he eased back into his apartment and instructed his wife to call “911” because “they had the Peeping Tom over there.” Mr. Atkins remained rnside and attempted to see outside through the “peephole” in Ms door, but could see nothing. After a few minutes he opened the door and saw a person sitting on the steps between the first and second decks of the same apartment building. He stated he knew it was the same person he had seen earlier by the “camouflage.”
Upon cross-examination, Mr. Atkrns admitted that he watched the person “just a few seconds” before he went back inside. He also stated that from the time he first observed the person to the time the police apprehended Bankhead, a total of five minutes “at the most” passed by, three of wMeh Mr. Atkins spent inside Ms apartment, unable to see anything. Mr. Atkins estimated he was standing seventy-five (75) yards away from the apartment in question, and admitted that it was dark and there were two obstructions in Ms view — a large light pole and a column which he was standing beMnd. However, AtMns testified that the column did not block Ms view of the suspect, and that he did not observe any other persons on the upper deck or the stairs in question.
Officer Larry Taylor of the Columbus Police Department stated that on February 6, 1990, he was on regular patrol duty. It had just turned dark and at approximately 6:35 p.m. he received a report of a suspicious person at the Chanticleer Apartments area. Upon arrival, he cut off the headlights of his patrol car and eased up to the apartments. He observed a person walk behind the apartments, and advised “911” that he had “spotted a subject walkmg behind the building.” Officer Taylor got out of his car, walked behind the apartment building, and “observed a black male sittmg about halfway up the steps on the back side of the apartments.”
Officer Taylor testified: “I continued to observe him for a little bit where he was looking into a window or — or a door window or sometMng like that at that time, and I observed two young ladies inside the apartment from another window that was just *117 adjacent to it.” Taylor continued that after he “made sure” the suspect was looking into the window, he identified himself and ordered the person to come down and lay face down on the ground. The record indicates that the window into which Taylor testified seeing Bankhead look was located downstairs, on the lower deck of the two-level complex. Taylor identified Bankhead as the man he arrested and stated that he was wearing a camouflage jacket and blue jeans at the time of the arrest.
During cross-examination, Taylor admitted that upon his arrival, the suspect walked behind the apartment building making it impossible to observe him further. He conceded it was also impossible for him to observe whether another person or persons were behind the apartment complex. Taylor testified he had a clear view of Bankhead as he sat on the steps looking into a downstairs window. Taylor stated that he never observed Bankhead looking into an upstairs window and never observed Bankhead on the upstairs balcony.
Miss Maria Krupica lived upstairs in Apartment # 4 at Chanticleer Apartments on February 6. It was her bathroom window that Witness Atkins testified to seeing a person looking into. Krupica stated that at the time she was in her bedroom watching television and did not know that anything occurred until she heard a disturbance downstairs, went outside and saw the police with Bank-head on the ground. She testified that her windows had curtains which were closed on the night in question.
Detective John Pevey, Columbus Police Department, testified that he had received prior reports of a suspicious person in the area at the same apartment complex in January 1990. Pevey stated an investigation ruled out Bankhead as a suspect in a rape in the same area which occurred January 27 between 2:00 and 3:00 p.m.; it was determined Bankhead was at work during those hours. Pevey admitted that another rape had occurred in the area following Bank-head’s arrest for voyeurism and an arrest had been made in that case.
Following the State’s case-in-chief, the defense moved for a directed verdict. Although the judge stated that the case presented “a very close question of fact” in that the State’s chief witnesses testified to observing a person at two different windows of two different apartments, he ruled that a jury issue had been presented as to whether the individual observed by Mr. Atkins was the same person arrested by Officer Taylor. The motion was thus denied.
Willie Bankhead testified to his version of the events: On the evening of February 6, 1990, he left his daytime job at four o’clock in the afternoon, and went to a laundromat where he remained until approximately five o’clock. He proceeded in his car toward Caledonia via Highway 45 where had a dinner date with his girlfriend at six-thirty. As he drove, the “engine” light on his dashboard came on, and the car “kind of start jumping ... as though it was going to cut off.” When he reached an intersection, he turned to get off the highway and the main flow of traffic. He intended to park his car and investigate the problem. Driving approximately one mile and upon reaching Sixth Street, Bank-head observed a laundromat and a small store and toned. He stated his car stopped running on Sixth Street. He looked under the hood and saw that the exhaust was “hot and red”.
Bankhead next walked back to the intersection and used the phone at the laundromat to call home, but got an answering machine and hung up. He again attempted to start his ear, but was unsuccessful, at which point he decided to try to find another way home. He first proceeded up Sixth Street, but saw no lights. He next went toward Park Circle and Seventh Street, in the direction of the Chanticleer Apartment complex. There he noticed a man standing behind the apartment complex smoking a cigarette, and approached him to ask for a ride or some type of help. The man replied he, too, was walking and walked away. Bank-head moved onto a flight on steps where he could better see his car. He stated he was sitting there “resting my chin in my hand” when he saw an officer who told him to “get down on the ground.” Bankhead stated he never went past the steps and was never on the second story of the building.
*118 During cross-examination, Bankhead admitted wearing a camouflage jacket on the night in question, and stated that the man he saw was not wearing such a jacket. He stated no one passed him and went up to the second story while he was sitting on the stairway. He denied looking into a downstairs apartment window while sitting on the stairway.
Mr. Porter Hubbard, a bail bondsman, testified he bailed Bankhead out of jail following his arrest. As part of his fee he collected Bankhead’s car, an ’83 Chevrolet Celebrity, the morning following Bankhead’s arrest. Hubbard testified he picked up the car from “Hall’s Wrecker and Body.” The mechanic there told him the reason the ear had quit was “it had ran hot and warped the head.” Hubbard stated he personally drove the car and “just when I’d get in the yard or wherever that I would get from one side of town to another it would heat up.... ” He stated it “finally just quit,” “ran hot and quit on me,” on a trip to Starkville. Since obtaining the car from Bankhead, Hubbard stated he had a new heating element, a new water pump and a new engine installed.
Bankhead appeals his conviction to this Court and asserts two assignments of error:
I. THE STATE FAILED TO PROVE EACH AND EVERY ELEMENT OF THE CRIME OF FELONIOUS TRESPASS (VOYEURISM), AND THE EVIDENCE PRESENTED BY THE STATE FAILED TO PROVE APPELLANT’S GUILT BEYOND A REASONABLE DOUBT AND TO THE EXCLUSION OF EVERY OTHER REASONABLE HYPOTHESIS CONSISTENT WITH INNOCENCE, AND THEREFORE WAS INSUFFICIENT TO SUPPORT THE JURY’S VERDICT.
II. THE TRIAL COURT ERRED IN NOT SUSTAINING THE APPELLANT’S MOTION FOR A DIRECTED VERDICT OR APPELLANT’S MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT OR SUSTAIN A CONVICTION.

DISCUSSION

As both of Bankhead’s assignments of error challenge the sufficiency of the evidence, they will be addressed together. Bankhead was charged with the crime of voyeurism, or trespass by “Peeping Tom” pursuant to Miss. Code Ann. Section 97-29-61, which reads:
Any person who enters upon real property whether the original entry is legal or not, and thereafter pries or peeps through a window or other opening in a dwelling or other building structure for the lewd, licentious and indecent purpose of spying upon the occupants thereof, shall be guilty of felonious trespass; and upon conviction, shall be imprisoned in the state penitentiary not more than five (5) years.
Bankhead strenuously argues that the State failed to establish that the person Mr. Atkins testified to seeing on the second story of an adjacent complex was him. As support, Bankhead submits the testimony of Officer Taylor, who stated when he arrived on the scene he saw Bankhead walk behind a building, and lost sight of him. Thereafter, Officer Taylor observed Bankhead sitting on a stairway for about 45 seconds and arrested him. Bankhead contends this testimony supports his own testimony that there was another black male behind the apartments “as Mr. Bankhead could not have been on the second deck of the apartments if the officer observed him going behind the building upon his arrival.” Finally, Bankhead emphasizes to the Court that there was no direct evidence of the identity of the person seen looking into Miss Krupica’s bathroom window.
The State responds that Officer Taylor’s testimony that he saw Bankhead sitting on the stairway “would tend to indicate that it was the same man whom Mr. Atkins had seen ... looking into Miss Krupica’s window.” Atkins testified he knew the man sitting on the stairway was the same man he had seen looking into the window earlier because he remembered the camouflage clothing the person wore. However, Atkins also admitted he never saw the man’s face and never identified Bankhead. Despite the lack of a positive identification of Bankhead, *119 the State contends the evidence was sufficient to find him guilty.
In light of the fact that the State’s lone “witness” to this incident, Atkins, could not identify Bankhead as the person he observed, the case is one involving purely circumstantial evidence. This Court, in Murphy v. State, 566 So.2d 1201, 1204 (Miss.1990), has cited the familiar standard to be applied in such a case:
The state could rely on circumstantial evidence, but where a case is based wholly upon circumstantial evidence, the state must prove Murphy’s guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Steele v. State, 544 So.2d 802, 808 (Miss.1989) (emphasis added); Leflore v. State, 535 So.2d 68, 70 (Miss.1988); Montgomery v. State, 515 So.2d 845, 848 (Miss.1987). This burden of proof is heavier than when direct evidence is offered.
In Murphy, the defendant was convicted of burglary based solely upon his possession of stolen equipment. The Court noted that “nowhere in the evidence did the state prove that it was Murphy who went into the shed and stole the chainsaws.” 566 So.2d at 1205. The Court continued its analysis, stating:
Accepting the evidence in the light most favorable to the state, including all reasonable inferences, as we must, the circumstances support the state’s hypothesis— that Murphy burglarized M & H Company. But, mere support for the state’s hypothesis in a case based entirely on circumstantial evidence is not enough, for it must be of such quality as to rise to the level of excluding every other reasonable hypothesis other than that of guilt.
Id. at 1204. (emphasis added). Concluding that “some other hypothesis may still be true,” this Court reversed and rendered the conviction. Id. at 1205; See also Wooldridge v. State, 274 So.2d 131 (Miss.1973) (Court cannot permit a conviction to stand based merely upon suspicion); Shepherd v. State, 403 So.2d 1287 (Miss.1981) (Court overturned burglary conviction where evidence could justify no more than a suspicion); Rawls v. State, 513 So.2d 942 (Miss.1987) (Though arousing suspicion, legal guilt, on these facts, remained unproven; conviction overturned).
We find that the State in the case sub judice failed to meet its burden of proof considering there is indeed a reasonable hypothesis, consistent with Bankhead’s innocence, for his being in the area at the time a “Peeping Tom” was reported.
There was testimony by Bankhead that he began experiencing ear trouble and left the highway, pulling over by a nearby laundromat. Bankhead looked under the hood and described the exhaust as “almost red hot.” Unsuccessful in reaching anyone at his home, Bankhead began walking. He testified he encountered a man near the Chanticleer Apartment complex, who was unwilling to assist him. Thereafter, he moved to a nearby stairway and was sitting there a few minutes later when he saw Officer Taylor standing in front of him. He was then arrested.
Nowhere in the record does there appear any testimony which effectively refutes Bankhead’s version of the events that night. Testimony by witness Porter Hubbard indicated it was quite possible, perhaps likely, that Bankhead’s car did overheat, legitimately placing him at the scene. Hubbard stated when he picked up Bankhead’s car, a mechanic told him the reason the car had quit running was “it had ran hot and warped the head.” Hubbard had personally experienced problems with the car overheating since obtaining it from Bankhead. Further testimony by Officer Taylor was that upon responding to a call of a “suspicious person,” Bank-head was observed walking behind the apartment complex. Officer Taylor testified that moments later he observed Bankhead seated on a stairway. The officer admitted he never saw Bankhead on the upstairs level of the complex or looking toward any upstairs window.
At the very least, we find the evidence against Bankhead inconclusive, and certainly insufficient to sustain a guilty verdict. In light of the evidence presented, and the State’s failure to refute Bankhead’s reasonable hypothesis of the events in question, the motion for a directed verdict or, alternative *120 ly, for a judgment notwithstanding the verdict, should have been granted.

CONCLUSION

In May v. State, 460 So.2d 778, 781 (Miss.1984), this Court emphasized the degree of evidence necessary to overturn a conviction:
[O]nce the jury has returned a verdict of guilty in a criminal ease, we are not at liberty to direct that the defendant be discharged short of a conclusion on our part that given the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty, (cite omitted).
We are forced to conclude in the case at bar that no reasonable, hypothetical juror could have found Bankhead guilty beyond a reasonable doubt; the identity of the “Peeping Tom” was never established and Bank-head’s own reasonable hypothesis, consistent with his innocence, was not refuted. The conviction is reversed and rendered.
REVERSED AND RENDERED.
HAWKINS, C.J., DAN M. LEE, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE and JAMES L. ROBERTS Jr., JJ., concur.
PRATHER, P.J., not participating.