# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-00853-SCT

*CEASAR JOHNSON, III a/k/a CEE CEE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/09/2015 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| TRIAL COURT ATTORNEYS: | LESLIE FLINT |
| | KELLIE WILLIAMSON KOENIG |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: JUSTIN T. COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/15/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1. Ceasar Johnson was convicted in the Bolivar County Circuit Court for being a felon in possession of a firearm and for the murder of Gregory Johnson. He was sentenced to life in prison. He now appeals the conviction, which we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On November 1, 2012, Gregory Johnson (Greg) was shot and killed while in his vehicle in the parking lot of J.Y. Trice Apartments in Rosedale, Mississippi. Ceasar Johnson

(Ceasar) was indicted for Greg's murder on August 26, 2013.[1] On April 9, 2015, a jury convicted Ceasar Johnson of being a felon in possession of a firearm and of murdering Greg. The circuit judge sentenced Ceasar to life in prison for the murder charge and to ten years for the felon-in-possession-of-a-firearm charge, with the two sentences to run consecutively. Ceasar filed a Motion for a New Trial on April 20, 2015. The trial court denied the motion on May 4, 2015. Ceasar timely filed his notice of appeal with this Court on June 3, 2015.

¶3. Ceasar Johnson asserted two issues on appeal: (1) Because the State's case rests solely on conjecture and supposition, and because Ceasar presented a reasonable hypothesis consistent with his innocence, the State presented insufficient evidence to convict Ceasar of first-degree murder and being a felon in possession of a firearm; and (2) because the State's case against Ceasar amounts to nothing more than a hunch, and because Ceasar presented compelling corroborated evidence of a reasonable hypothesis consistent with his innocence, the overwhelming weight of the evidence requires a new trial.

**DISCUSSION**

*A. Sufficiency of the Evidence*

¶4. When reviewing a challenge to the sufficiency of the evidence, this Court will reverse and render only if the facts and inferences "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." ***Brown v. State***, 965 So. 2d 1023, 1030

---

[1]Ceasar also was indicted on three other counts: 1) possession of a firearm by a convicted felon; 2) witness intimidation concerning Brontavious Cooper; and 3) witness intimidation concerning Darren Conway. Because neither Cooper nor Conway was present the first day of trial, the court severed the witness-intimidation charges.

(Miss. 2007) (quoting *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005)). The evidence will be deemed sufficient if "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense." *Brown*, 965 So. 2d at 1030 (quoting *Bush*, 895 So. 2d at 843). This Court also considers the evidence in the light most favorable to the State. *Bush*, 895 So. 2d at 843. The State receives the benefit of all favorable inferences that reasonably may be drawn from the evidence. *Wilson v. State*, 936 So. 2d 357, 363 (Miss. 2006).

¶5.     The instant case was based on circumstantial evidence since Ceasar did not confess and there were no eyewitnesses to the crime. As a result, the State had the burden to prove Ceasar's guilt "not only beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis consistent with innocence." *Beasley v. State*, 136 So. 3d 393, 402 (Miss. 2014) (quoting *Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988)). However, this Court repeatedly has held that "direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Underwood v. State*, 708 So. 2d 18, 35 (Miss. 1998) (quoting *Conner v. State*, 632 So. 2d 1239, 1252 (Miss. 1993)).

¶6.     Ceasar was convicted pursuant to Mississippi Code Section 97-3-19(1)(a), which defines murder as: "The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). Therefore,

the prosecution is required to prove beyond a reasonable doubt that: "(1) the defendant killed the victim; (2) without authority of law; and (3) with deliberate design to effect his death." *Brown v. State*, 965 So. 2d 1023, 1030 (Miss. 2007).

¶7. Ceasar claims that the State failed to exclude every reasonable hypothesis consistent with his innocence, as someone else could have killed Greg. After a review of the State's evidence, we find that the State presented sufficient evidence to show that Ceasar murdered Greg and that the other hypotheses were not reasonable.

¶8. At trial, the State presented evidence that Ceasar had planned to rob Greg. Christopher McKenzie, an admitted cocaine addict, testified that, maybe one or two weeks before Greg was murdered, he heard Ceasar speaking with two other men abut robbing Greg. Because Ceasar sold drugs for Greg, the State argued that Ceasar was looking to move up the supply chain. No evidence was presented to contradict McKenzie's testimony.

¶9. Devenje Edwards, Ceasar's girlfriend at that time, testified that Ceasar had sold marijuana. Edwards stated that at the time of the murder, Ceasar was living in Rosewood Apartments with his sister. Rosewood Apartments were approximately two miles from J.Y. Trice Apartments and about half of a mile from the Double Quick. She testified that she was with Ceasar, his father, and his sister the night of November 1, 2012, at the laundromat until she left to go to her grandmother's house. Ceasar did not tell her where he was going afterward that night.

¶10. Kiadric Scott testified that he had seen Greg and Ceasar together at J.Y. Trice apartments. He stated that Greg and Ceasar regularly parked at the J.Y. Trice Apartments.

4

Initially, in his official statement to investigators, he claimed that this was later in the evening, closer to the time of the murder, but at trial, he testified that it was "way before it got dark." He also claimed that Ceasar was his "homeboy."

¶11. The State's evidence puts Greg and Ceasar together immediately before the shooting occurred. A Double Quick security videotape placed Ceasar in Greg's vehicle immediately before the shooting occurred. The video recorded substantial movement between Greg and Ceasar in the vehicle, but no reason for the movement was apparent. Counsel at trial made no issue of: the identity of Greg or Ceasar; the fact they were in Greg's car, in which Greg was later found murdered; or the date and time stamp of the video. The security video showed Greg with Ceasar in the passenger seat of his vehicle, pulling out of a Double Quick parking lot at 10:18 p.m. At 10:26 p.m., or eight minutes later, police informed dispatch that they were responding to a call reporting a murder at the J.Y. Trice Apartments.[2] J.Y. Trice Apartments are approximately one mile from the Double Quick.

¶12. Larita Love and her boyfriend Jonathon Smith were the first on the scene of the murder. Smith had arrived at Love's apartment at the J.Y. Trice Apartments at about 9:40 p.m. Love and Smith had a long-term relationship, and he was the father of her children. From her daughter's bedroom window, Love saw Greg sitting in his car in the parking lot. She did not see anyone else in the vehicle. Shortly thereafter, she testified that she heard the

---

[2]Both Officer Michael Honorable and Investigator Michael Williams testified that they were dispatched at 10:26 p.m. However, after further questioning, Investigator Williams conceded that it could have been 10:31 p.m. The dispatch record conflicts as to whether the call was placed at 10:26 or 10:31 p.m.

car spinning off and two to three gunshots, followed by a crash.[3] Greg's vehicle crashed partially through the exterior wall of their daughter's bedroom, hitting the bed. Smith retrieved their daughter, who was the only one in the room at the time, from her bed. Panicked, Smith and Love then went outside to investigate. Smith found that the engine was running, the tires were spinning, and Greg was slumped over the wheel. Smith cut off the car's engine. Love got the children and drove to find some help and located Officer Honorable on the highway a short distance away. Smith went first to the apartment manager's office, then to a neighbor, Brontavious Cooper, whom he asked to call 911 and go get help. As Smith was returning to the scene of the accident, Officer Honorable arrived on the scene. Both Love and Smith testified that they did not use their cell phones because they "panicked" and were "scared."

¶13.    Though Love testified that Greg was alone in the vehicle, Dr. Erin Barnhart, the pathologist who performed the autopsy, testified that Greg was shot twice, in the face and head, from the passenger side or from right to left. The first shot was fired from an intermediate range, not directly against the skin but from a distance of less than three feet. The range of the second shot could not be determined because the victim's hair surrounded the wound and obscured the pathologist's view of the skin.

¶14.    Following the incident, Smith was tested for the presence of gunshot residue on his hands. The right hand was completely clear of any residue, while the back of the left hand was positive. However, the laboratory technician testified at trial that the "indicative particle

---

[3]Love testified the shots and crash occurred three to four minutes after she looked out the window. Smith testified it was shortly thereafter.

6

[did] not possess the combination of morphological characteristics and elemental composition necessary to identify it as gunshot residue to the exclusion of all other environmental sources." Smith and Love both complied with the police investigation and were questioned. Smith testified that he had not changed his clothes between the time of the incident and his going to the police station for questioning.

¶15. Cooper testified that almost a month after Greg's murder, Ceasar had approached him while he was working at the Double Quick gas station. He testified that Ceasar had questioned him about whether the Drug Enforcement Administration (DEA) had spoken to him and whether he had told the DEA that Ceasar "pulled the trigger," speaking of Greg's murder. He also testified that the conversation concerned him and that he felt "kind of shaken up" after the exchange.

¶16. The defense did not present an alternative theory as to how Greg was murdered. Instead, the defense presented testimony from several friends and relatives of the defendant that attempting to show that Ceasar was dropped off at another apartment complex before the murder occurred. Alfreada Hudson, Ceasar's sister, testified that at 10:00 or 10:18 p.m., Ceasar was at the Rosewood Apartments with Greg. She also testified that after Greg dropped off Ceasar, the group, including her, Ceasar, her sister, and her father, headed toward Greenville to go to a casino. However, after they received news about the shooting, they decided to go to Walmart and Wendy's. Camelisha Thomas, Hudson's and Ceasar's sister, corroborated this account. However, no receipts were ever presented in support of this alibi. Lasheba Matthews, a friend of Ceasar's family, also testified that she had seen Ceasar

7

get out of Greg's car at Rosewood Apartments. Matthews came forward as a witness thirty-seven days before the trial began.

¶17.    The time sequence creates an objective factor to test the reliability and credibility of the witnesses' various accounts.  Viewing the evidence in the light most favorable to the State and the jury's verdict, the short time lapse renders the alleged intervening stop at Rosewood Apartments implausible.  "A mere fanciful or farfetched or unreasonable hypothesis is not sufficient to require an acquittal . . . ." *Cotton v. State*, 144 So. 3d 137, 140 (Miss. 2014) (quoting *Montgomery v. State*, 515 So. 2d 845, 848 (Miss. 1987)). Additionally, the burden of determining witness credibility is placed on the jury. *Jones v. State*, 920 So. 2d 465, 472 (Miss. 2006).  Sufficient evidence existed on which a jury reasonably could have relied to find, beyond a reasonable doubt, that Ceasar murdered Greg. Because: (1) the jury reached this conclusion, (2) Ceasar was an undisputed felon, and (3) Greg died of gunshot wounds, it is clear that sufficient evidence existed on which a jury could have found that Ceasar was a felon in possession of a firearm.  Ceasar's argument here is without merit.

*B. Weight of the Evidence*

¶18.    This Court will reverse only if the lower court abused its discretion in denying a motion for new trial. *Howell v. State*, 860 So. 2d 704, 764 (Miss. 2003) (citing *Edwards v. State*, 800 So. 2d 454, 464 (Miss. 2001); *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999)).  A new trial should be granted on the basis of the weight of the evidence "only in

8

exceptional circumstances, when the evidence weighs heavily against the jury's verdict."
*Wilson v. State*, 936 So. 2d 357, 363 (Miss. 2006) (citing *Bush*, 895 So. 2d at 845).

¶19.    Except for Matthews, all Ceasar's witnesses to the Rosewood stop were family members. Matthews was a neighbor of one of Ceasar's sisters and obviously was acquainted with the family. Based on the uncontroverted time stamp from the Double Quick of 10:18 p.m., Hudson's testimony that she, her sister Thomas, and Ceasar gathered at 10:00 p.m. or 10:18 p.m. prior to leaving for the casino is sequentially impossible. While Love did not see a passenger in Greg's car when she looked out the window, the testimony of the pathologist would be consistent with the shooter firing the fatal shots while standing outside the front-seat passenger window of the vehicle or sitting in the passenger seat. This fact, the alleged intimidation of Cooper[4] by Ceasar, and the other evidence offered by the State, supports Ceasar's conviction, and we cannot say that the evidence preponderates heavily against the jury's decision to convict Ceasar of being a felon in possession of a firearm and of murdering Gregory Johnson. The trial court therefore did not abuse its discretion in denying a new trial.

## CONCLUSION

¶20.    After a thorough review of the record in this case, we find that sufficient evidence existed to convict Ceasar Johnson and that the verdict was not against the overwhelming weight of the evidence. Therefore, we affirm the trial court's judgment.

---

[4] Originally the State brought two witness-intimidation charges against Ceasar but each was severed when both witnesses failed to show up on the first day of trial. Cooper eventually did show up at trial and testified, but the witness-intimidation charge already had been severed at that point.

9

¶21. **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE SHALL RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED. COUNT II: CONVICTION OF POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE SHALL RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I.**

**RANDOLPH, P.J., LAMAR, MAXWELL AND BEAM, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., KITCHENS AND COLEMAN, JJ.**

**KING, JUSTICE, DISSENTING:**

¶22. Because I believe the State proved only the possibility of Ceasar Johnson's guilt and failed to exclude all reasonable hypotheses consistent with his innocence, I dissent.

¶23. The critical inquiry when considering whether the evidence is sufficient to sustain a conviction is whether the evidence shows "beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction." *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). If the facts and inferences "'point in the favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the

10

defendant was guilty,' the proper remedy is for the appellate court to reverse and render." *Id.*

(quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)).

¶24.    Because this case does not involve a confession and because no physical evidence or eyewitness testimony was presented linking Ceasar to Greg Johnson's murder, this case is entirely one of circumstantial evidence. Circumstantial evidence is evidence "which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *McInnis v. State*, 61 So. 3d 872, 875 (Miss. 2011) (quoting *Keys v. State*, 478 So. 2d 266, 268 (Miss.1985)). "The State could rely on circumstantial evidence, but where a case is based wholly on circumstantial evidence, the [S]tate must prove [the defendant's] guilt beyond a reasonable doubt *and to the exclusion of all reasonable hypotheses consistent with innocence.*" *Murphy v. State*, 566 So. 2d 1201, 1204 (Miss. 1990) (emphasis in original). The burden in a purely circumstantial-evidence case is heavier than the burden in a direct-evidence case. *Id.* The trial court gave a circumstantial-evidence jury instruction and a two-theory instruction.[5]

¶25.    Put differently, because the State presented no direct evidence, the State must have proven Ceasar's guilt to the exclusion of all reasonable hypotheses consistent with his

---

[5]Instruction C-4A stated: "A Defendant in a criminal case has no burden of proof whatsoever. The State of Mississippi, on the other hand, must prove beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant committed the acts as alleged in the indictment." Jury instruction C-26 stated: "The Court instructs the jury that if there are two reasonable theories arising out of the evidence in this case; one tending to prove that the defendant did commit the crime as alleged in the indictment and the other tending to show that the defendant did not commit the aforesaid crime, and you are unable to determine from the evidence which of the two theories is true, the jury must accept that the theory most favorable to Caesar [sic] Johnson, III and find him not guilty."

innocence. Previously, in ***Murphy***, this Court reversed the defendant's burglary conviction after determining that the State's evidence established nothing more than a probability of guilt. ***Murphy***, 566 So. 2d at 1206. Although the State had proven that two stolen chainsaws had been in the defendant's possession, the defendant argued that he had not stolen the chainsaws but had found them in plastic bags behind a dumpster. ***Id.*** at 1203. This Court found that the State had failed to exclude the reasonable hypothesis that someone else had broken into the shed and stolen the chainsaws. ***Id.*** at 1206.

¶26.    Similarly, in ***Steele***, the defendant's capital-murder conviction was reversed after this Court determined that the evidence did not link the defendant with the victim's injury. ***Steele v. State***, 544 So. 2d 802, 808 (Miss. 1989). The State had proven that the defendant likely had burned with a hair dryer a young girl he was babysitting and that the young girl probably had not sustained her head injury by falling off her bed. ***Id.*** at 809. However, the State failed to prove that the burns were not inflicted by someone else or that the girl did not fall while jumping on her bed. ***Id.*** This Court stated, "[t]he problem in this case is that the evidence 'merely establishes some finite probability in favor of' the state's hypothesis." ***Id.***

¶27.    The ***Hester*** Court also reversed the defendant's capital-murder conviction, finding that the State had failed to exclude the reasonable hypothesis that a third party had been the victim's assailant. ***Hester v. State***, 463 So. 2d 1087 (Miss. 1985). The victim was stabbed to death in a wooded area that had been covered with leaves after leaving the bar with the defendant, and the defendant had returned to the bar alone in an upset and disheveled condition. ***Id.*** at 1092. However, because the State presented no evidence linking the

defendant with a knife found at the defendant's house and failed to overcome the reasonable hypothesis that someone else had robbed and stabbed the victim, the defendant's presumption of innocence prevailed. *Id.* at 1093-94. And in the *Sanders* case, a sixteen-month-old girl was found starved to death in a room to which the defendant had the only key. *Sanders v. State*, 286 So. 2d 825 (Miss. 1973). Yet this Court reversed the defendant's conviction after the State failed to rebut the reasonable hypothesis that someone else had locked the girl in the room. *Id.* at 829.

¶28.   Similarly here, I believe the State failed to rebut the reasonable hypothesis that someone else killed Greg. While the State presented evidence showing that Ceasar *could have* murdered Greg, as this Court previously has emphasized, "[i]t is fundamental that convictions of crime cannot be sustained on proof which amounts to no more than a *possibility* or even when it amounts to a *probability*." *Murphy*, 566 So. 2d at 1204 (emphasis in original) (citations omitted). For conviction, evidence of Ceasar's guilt "must rise to the height which will exclude every reasonable doubt; that *when in any essential respect the state relies on circumstantial evidence, it must be such as to exclude every other reasonable hypothesis* than that the contention of the state is true, and that throughout the burden of proof is on the state." *Id.* (emphasis in original). As testimony indicates, a reasonable hypothesis consistent with Ceasar's innocence is that Ceasar was not at J.Y. Trice Apartments when Greg was murdered and that someone else murdered Greg.

¶29.   The majority first states that the State presented evidence that Ceasar had planned to rob Greg. Christopher McKenzie, an admitted cocaine addict, testified that he was not friends

13

with Ceasar at all. McKenzie testified that, in reference to Ceasar, "Like I say I may -- I know him, but I don't -- didn't know him know him. . . . I know him, but I didn't know him very well at the time." He testified that one night, probably a week or two before Greg was murdered, he heard Ceasar talking to two other men about robbing Greg.[6] McKenzie had not been in the same room as the three men when he overheard the conversation and stated that there had been a wall between him and the others. He testified that all three men had been talking about robbing different people. At the time he testified that he had overheard Ceasar, McKenzie had just bought cocaine and he stated that he was "fixing to get high." His statement to the police said that he had been in the laundry room "getting high" when he overheard the conversation. At trial, McKenzie admitted that he had been smoking crack when he stated he heard Ceasar say this.[7] Even if McKenzie's testimony was accurate, his statement does not link Ceasar to Greg's murder. Ceasar was not charged with robbery and no evidence was presented that Greg had been robbed that night.

¶30.    The majority also states that Ceasar had been with Devenje Edwards, his girlfriend at the time, previously that night at the laundramat and that "Ceasar did not tell her where he was going afterwards that night." Yet the failure to inform one's girlfriend of what one intends to do is not evidence supporting murder.

---

[6]In response to a question asking how long before the murder the conversation occurred, McKenzie stated, "I think it was like a week or two." McKenzie testified that it was at night but he did not know what time.

[7]The record is unclear as to how McKenzie knew that Ceasar was the one who had talked about robbing Greg. His statement to the police does not specifically identify Ceasar but states that "him and some of his friends" were talking and that "he's selling drugs for 'Little Greg.'" McKenzie testified at trial that he was referring to Ceasar.

14

¶31. Kiadric Scott testified that on November 1, 2012, he had been at J.Y. Trice Apartments "way before it got dark" and that he had seen Greg and Ceasar there together. He stated that Greg had been "backed up there all the time, just chilling." Although Scott testified that it was earlier in the day when he had seen the two together, Scott had given a statement to investigators that he had just gotten his hair fixed at J.Y. Trice Apartments when he saw Greg and Ceasar parked in the same parking spot where Greg was murdered at "nine going on ten" o'clock that night. Whether Scott had seen Ceasar and Greg around "nine going on ten" or earlier in the day, either time was before Ceasar and Greg went to the Double Quick. Therefore, Scott's testimony did not constitute evidence that Ceasar had been present at J.Y. Trice Apartments after 10:00 p.m.

¶32. The evidence presented also did not refute the testimony of three witnesses that Greg had dropped off Ceasar at Rosewood Apartments before he was murdered. *See **Bankhead v. State***, 626 So. 2d 115, 119 (Miss. 1993) ("Nowhere in the record does there appear any testimony which effectively refutes Bankhead's version of the events that night."). Hudson testified that Greg had dropped off Ceasar at the Rosewood Apartments around 10:00 or 10:18 that night and that Greg had left Rosewood Apartments alone. She stated that Ceasar had received a call while on the way to Greenville that Greg had been killed and that the family had been so upset that they had canceled their plans and turned around to get something to eat instead. Thomas corroborated Hudson's testimony, stating that she was with Hudson when they picked up Ceasar from Rosewood Apartments at 10:18 that night and that Greg had dropped off Ceasar and had left the apartments alone. Matthews, who was not

15

related to Ceasar or his family, testified that she lived at Rosewood Apartments and saw Ceasar get out of Greg's car that night in the Rosewood Apartments parking lot. Matthews stated that when she got into her car, Greg had been driving out of the apartment complex and that Ceasar had been walking to his sister's car.

¶33. In contrast, the State presented no testimony or evidence that Ceasar was present at J.Y. Trice Apartments after Ceasar and Greg left the Double Quick. In fact, even taking all of the evidence presented as true, I believe the State failed to disprove the reasonable hypothesis that someone else shot Greg. *See **Woolridge v. State***, 274 So. 2d 131, 133 (Miss. 1973) ("Assuming that everything testified to by the state witnesses is absolutely true, there still remains a reasonable hypothesis other than that Woolridge burglarized the bank . . . ."). Even testimony from the State's witnesses fails to merit an inference that Ceasar was at J.Y. Trice Apartments after leaving the Double Quick. Love testified that when she looked out of the window to see whose car was parked outside her apartment, she did not see anybody in the passenger seat of Greg's car.[8] Moreover, although Smith and Love were the first to discover that Greg had been shot, neither of them called 911 despite both having cell phones on their persons. And Smith had tested positive for a particle indicative of gunshot residue on the back of his left hand in a gunshot-residue test, despite stating that he had not held or shot a gun that day.

---

[8]The State asked Love, "Did you see anyone inside the car?" Love responded, "Yes. I saw somebody in the driver's side." The State asked, "Could you see the passenger side of the vehicle?" Love replied, "Yes, but I didn't see anybody."

16

¶34. The majority states that "the defense did not present an alternative theory as to how Greg was murdered." However, the defense is in no way required to present an alternative theory to how Greg was murdered. In all likelihood, the defense did not know, and could not have known, how Greg was murdered. Anybody could have shot Greg that night between the time Ceasar and Greg left the Double Quick and the time Love flagged down Officer Honorable. The majority additionally uses the alleged intimidation of Cooper to support Ceasar's conviction. I believe this is improper, as the witness-intimidation charges were severed and were not proven at trial. "In a criminal case the accused is protected, at every stage of the trial, with a presumption of innocence and until he is proven guilty beyond a reasonable doubt by proper and competent evidence." *White v. State*, 532 So. 2d 1207, 1226 (Miss. 1988) (quoting *Moore v. U.S.*, 271 F.2d 564 (4th Cir. 1959)). An allegation should not be considered evidence, especially not evidence in support of a murder conviction.

¶35. Clearly, a reasonable hypothesis consistent with Ceasar's innocence is that Ceasar was miles away from the J.Y. Trice Apartment complex, on the way to Greenville with his family, when Greg was murdered and that someone else murdered Greg. I believe that the State proved only the possibility of Ceasar's guilt in this case. The concept of justice would become markedly smaller indeed if life and liberty hinged on mere possibilities. Because I believe the State failed to exclude all reasonable hypotheses consistent with Ceasar's innocence and that the State failed to rebut the presumption of Ceasar's innocence, I respectfully dissent and submit that his deliberate-design-murder conviction must be overturned.

17

**DICKINSON, P.J., KITCHENS AND COLEMAN, JJ., JOIN THIS OPINION.**